IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RESURRECTION SCHOOL; CHRISTOPHER MIANECKI, individually and as next friend on behalf of his minor children C.M., Z.M., and N.M.; and STEPHANIE SMITH, individually and as next friend on behalf of her minor child F.S., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT GORDON, in his official capacity as the Director of the Michigan Department of Health and Human Services; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan; LINDA S. VAIL, in her official capacity as the Health Officer of Ingham County; and CAROL A. SIEMON, in her official capacity as the Ingham County Prosecuting Attorney, <br><br> Defendants. | No. 20-cv-1016 <br><br><br> **EXPEDITED CONSIDERATION REQUESTED** |

**PLAINTIFFS'BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

GREAT LAKES JUSTICE CENTER
Erin Elizabeth Mersino (P70886)
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
Tel: (517) 322-3207; Fax: (517) 322-3208
erin@greatlakesjc.org

AMERICAN FREEDOM LAW CENTER
Robert J. Muise, Esq. (P62849)
P.O. Box 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org
*Attorneys for Plaintiffs*

## ISSUE PRESENTED

Whether the enactment and enforcement of the challenged order issued by the Michigan Department of Health and Human Services ("MDHHS Order") violates Plaintiffs' rights guaranteed by the United States and Michigan Constitutions and Michigan law, thereby causing irreparable harm sufficient to warrant the requested injunctive relief.

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs seek a Temporary Restraining Order (TRO) and preliminary injunction to immediately enjoin the challenged order issued by the Michigan Department of Health and Human Services ("MDHHS Order"), which mandates, *inter alia*, the wearing of masks, including the wearing of masks by children in grades K through 5 throughout the school day at their desks, subject to criminal and civil penalties. As set forth in this brief, the challenged order violates Plaintiffs' fundamental liberties protected by the United States and Michigan Constitutions, and they violate Michigan law.

Accordingly, Plaintiffs seek an immediate TRO (*ex parte*) enjoining the mandates set forth in the MDHHS Order that require children in grades K through 5 to wear face coverings throughout the school day as applied to Plaintiffs.[1] The relief requested in Plaintiffs' motion for a TRO is ***narrow***. Plaintiffs' motion for a TRO specifically requests relief from the MDHHS Order for K through 5 students when they are seated at their desks, distanced from one another and from faculty, and engaging in the curriculum of their Catholic school.

Through this motion, Plaintiffs also seek an order preliminarily enjoining <u>all</u> of the mandates set forth in the MDHHS Order as this order is unlawful under the United States and Michigan Constitutions and Michigan law.

## STATEMENT OF FACTS[2]

Plaintiff Resurrection School is a Catholic school that has adopted a curriculum and disciplinary policies that provide an education based upon the teachings of the Catholic faith. (Resurrection Decl. ¶ 1). Resurrection School exists as an alternative educational system with a

---

[1] A proposed TRO has been submitted with this brief.
[2] Plaintiff Resurrection School's declaration is attached to this brief as Exhibit 1. Plaintiff Christopher Mianecki's declaration is attached to this brief as Exhibit 2. And Plaintiff Stephanie Smith's declaration is attached to this brief as Exhibit 3.

unique philosophy and purpose.  (Resurrection Decl. ¶ 2).  Above all, the school strives to build a strong sense of Catholic identity and spiritual well-being in its students. (Resurrection Decl. ¶ 2).   The students  are  the  focus  and  reason  for  the  existence  of  Resurrection  School. (Resurrection Decl. ¶ 14).  The faculty works for the betterment, education, and divinization of their students, as the ultimate goal of Catholic education is to prepare each child to become a Saint.  (Resurrection Decl. ¶ 14).

Plaintiff Mianecki is the father of, C.M., a kindergartener; Z.M., a third grader; and N.M., a fifth grader at Resurrection School in Lansing, Michigan.  (Mianecki Decl. ¶ 2).  Plaintiff Smith is the mother of F.S., a fourth grader who attended a Catholic school in the Diocese of Lansing.  (Smith Decl. ¶ 2).  Due to the conditions imposed by MDHHS' order, F.S. is no longer able to attend his Catholic school.  (Smith Decl. ¶¶ 2-21).

## I.      Religious Education Founded on a Catholic Virtue Based Curriculum and its Corresponding Disciplinary Policies

In  the  Catholic  faith,  selecting  a  Parish  and  its  Parish  school  involves  a  deep  faith discernment as "[t]he parish is the Eucharistic community and the heart of the liturgical life of Christian families; it is a privileged place for the catechesis of children and parents."  CCC § 2226; (Resurrection Decl. ¶ 62).  And "parents have the right to choose a school for them which corresponds to their own convictions.  This right is fundamental.  As far as possible parents have the duty of choosing schools that will best help them in their task as Christian educators.  Public authorities  have  the  duty  of  guaranteeing  this  parental  right  and  of  ensuring  the  concrete conditions for its exercise."  CCC § 2229.

Plaintiffs Mianecki and Smith specifically selected their Catholic schools to help them raise their children in their faith.  (Mianecki Decl. ¶ 3, 42; Smith Decl. ¶ 3, 28).  Catholic schools

are called to partner with parents to provide this education according to church teachings. (Resurrection Decl. ¶ 15).

Therefore, Plaintiff Resurrection School's disciplinary policies are designed to instill Christian formation by which children become disciples of Christ. (Resurrection Decl. ¶ 3). Resurrection School believes that it is through the individual formation of each child that they are able to see themselves and the world through God's eyes, and to act as God would have him act at all times. (Resurrection Decl. ¶ 3). The goal, then, of discipline is to recognizes the dignity of each human person and to take into consideration the workings of grace as well as of sin and conversion. (Resurrection Decl. ¶ 3). The word "discipline" comes from the same root as the word "disciple," which means to learn. (Resurrection Decl. ¶ 3). The Disciple of Christ Virtue Curriculum adheres to the Catechism of the Catholic Church (CCC) that requires, "[t]he virtuous person tends toward the good with all his sensory and spiritual powers; he pursues the good and chooses it in concrete actions." CCC § 1803; (Resurrection Decl. ¶¶ 4, 5). The school intentionally selects and focuses on virtues to be cultivated in each of its students for their religious formation. (Resurrection Decl. ¶ 4). Resurrection School requires that faculty or staff members identify the specific virtues a child may need to cultivate. (Resurrection Decl. ¶ 4).

Resurrection School seeks to instill confidence in its students and encourage social interactions that replicate the life and teachings of Jesus Christ. (Resurrection Decl. ¶ 9). For example, Resurrection School seeks to impart the virtue of mercy through actions of forgiveness. (Resurrection Decl. ¶ 10). When a student has wronged or hurt another student, a teacher guides the student through the reconciliation process and facilitates a face to face apology with the student who was harmed. (Resurrection Decl. ¶ 10). Resurrection School sees moments of conflict, whether working on a difficult concept, struggling with reading or a complex math

concept, or disagreement between students, as moments to evangelize.  (Resurrection Decl. ¶ 11).  Resurrection School is devoted to helping and serving all students, especially students who inspire others through persisting and learning with exceptionalities, such as learning disabilities, an extra twenty-first chromosome, or setbacks from a troubled childhood.  (Resurrection Decl. ¶ 12).

## II.      Plaintiff Resurrection School's COVID-19 Safety Protocol

In preparation for the 2020-21 school year, Resurrection School established strict safety protocols and methods to return to in-person schooling.  (Resurrection Decl. ¶ 19).  The work is memorialized as Resurrection's COVID-19 Preparedness and Response Plan 2020-21. (Resurrection Decl. ¶ 19).  Resurrection School requires that students wear masks walking into school and in any common areas of the school, such as hallways.  (Resurrection Decl. ¶ 20).  The school has implemented a map and traffic system to establish social distancing when parents drop students off at the beginning of the school day and pick students up at the end of the day. (Resurrection Decl. ¶ 20).  Resurrection School requires strict health screening before a child may enter the school that follows local and state health screening protocol.  (Resurrection Decl. ¶ 21).

Individual classes are considered to be "cohorts" and do not interact with other classes. (Resurrection Decl. ¶ 22).  Resurrection School follows a traffic schedule for the hallways, so no cohorts interact in common areas throughout the day.  (Resurrection Decl. ¶ 22).  The classes are then further broken down into a "pod" with just three other students.  (Resurrection Decl. ¶ 22). Student pods sit by each other in the classroom, eat lunch together, attend Mass together, while practicing social distancing.  (Resurrection Decl. ¶ 24, 30).  Resurrection School requires social distancing in the classroom and in all common areas with postings throughout the school to

indicate proper distancing.  (Resurrection Decl. ¶ 29).  As they enter any classroom, the children are directed to use the wall-mounted sanitizer dispenser.  (Resurrection Decl. ¶ 25; Mianecki Decl. ¶ 6).  Resurrection school ensures student hygiene by teaching proper handwashing and designating multiple times throughout the day for cohorts to wash their hands and use hand sanitizer.  (Resurrection Decl. ¶ 25; Mianecki Decl. ¶ 6).

Resurrection School follows a strict sanitization protocol.  (Resurrection Decl. ¶ 28). Resurrection School installed UV-C air purification systems in each room to kill airborne containments and continuously runs the systems when the school is in session.  (Resurrection Decl. ¶ 27; Mianecki Decl. ¶ 9).  No less than three times a day, the school uses a commercial grade antimicrobial fogger to disinfect all common areas.  (Resurrection Decl. ¶ 28; Mianecki Decl. ¶ 9).  All surfaces are cleaned at least every four hours as outlined by the EPA and the CDC.  (Resurrection Decl. ¶ 28).

Every family at Resurrection School must adhere to the school's policies in order to continue attending school.  (Resurrection Decl. ¶ 31; Mianecki Decl. ¶ 10).  This includes such things as continuous monitoring of the students and family's health for COVID-19 symptoms and taking students' temperatures at home every morning using an oral, tympanic, or temporal scanners.  (Resurrection Decl. ¶ 31; Mianecki Decl. ¶ 10).  Anyone experiencing any potential symptoms of COVID-19 or who has been in close contact to a positive case must stay home. (Resurrection Decl. ¶ 31).

The parents at Resurrection School have committed to not using any busing to avoid any contact between different cohorts and to avoid contact with anyone outside the school. (Resurrection Decl. ¶ 32; Mianecki Decl. ¶ 11).  Families at Resurrection School are committed

to limiting their contact with others outside of school hours to reduce the spread of COVID-19. (Resurrection Decl. ¶ 31; Mianecki Decl. ¶ 12).

No outside visitors are allowed in the school. (Resurrection Decl. ¶ 26; Mianecki Decl. ¶ 8). No teachers who also teach at another school are allowed into the school. (Resurrection Decl. ¶ 26). They must teach virtually, and their lessons are uploaded for completion from home. (Resurrection Decl. ¶ 26). Resurrection School has suspended all school assemblies that would involve more than one cohort. (Resurrection Decl. ¶ 31; Mianecki Decl. ¶ 13). Resurrection School has suspended all field trips. (Resurrection Decl. ¶ 31; Mianecki Decl. ¶ 15). Resurrection School has suspended all extra-curricular activities involving kindergarten through fifth grade. (Mianecki Decl. ¶ 14). To date, Resurrection School has avoided any outbreaks within its school due to following this strict protocol. (Resurrection Decl. ¶ 38). Resurrection School intentionally and carefully had preserved the most important aspect of its school: the religious and virtue-based education received in the classroom. (Resurrection Decl. ¶ 37).

### III. Facial Coverings for Students in Kindergarten to Fifth Grade When Seated at their Desks, Socially Distanced and in their Assigned Pods within their Assigned Cohorts

From August 2020 until October 9, 2020, Resurrection School educated its students without any outbreak or transmission of COVID-19 pursuant to extensive safety protocol. (Resurrection Decl. ¶ 39; Mianecki Decl. ¶ 18). The children in kindergarten through fifth grade were not required to wear facial coverings in the classroom while seated at their desks. (Resurrection Decl. ¶ 39; Mianecki Decl. ¶ 18). This practice did not pose a danger to health and safety; there were no incidences of COVID-19. (Resurrection Decl. ¶ 39). And the practice allowed children to remove their facial coverings at their desks while engaging in Resurrection School's curriculum. (Resurrection Decl. ¶ 39).

On October 9, 2020, however, Defendant Director Gordon issued the MDHHS order, requiring all children in grades kindergarten through fifth grade to wear facial coverings in the classroom at all times. (Resurrection Decl. ¶ 40).  The MDHHS order provides:

> A person responsible for a business, government office, school, or other operation, or an agent of such person, must not allow indoor gatherings of any kind unless they require individuals in such gatherings (including employees) to wear a face covering, subject to the exceptions in section 6 of this order. For schools in Region 6, the wearing of face coverings is strongly recommended, but not required.

(Doc. No. 1 at Ex. 1).  The order then provides a number of exemptions, including but not limited to the following:

- Anyone who is at a polling place for purposes of voting in an election.

- Anyone who is engaging in a religious service.

- Anyone who is seated at a tabletop or bar top to eat or drink at a food service establishment or bar.

- Anyone receiving a service for which the temporary removal of the face covering is necessary.

- Anyone who is asked to temporarily remove a face covering for identification purposes.

- Anyone who is actively engaged in a public safety role, including but not limited to law enforcement, firefighters, or emergency medical personnel, and where wearing a face covering would seriously interfere in the performance of their public safety responsibilities.

- All schools and students in Region 6, which encompasses Traverse City and rural counties surrounding that geographic area.

- Children younger than 5-years-old when the child is not in school or in a daycare setting.

- Anyone who cannot medically tolerate a face covering.

- Anyone who is giving a speech for broadcast or to an audience, provided that the audience is at least six feet away from the speaker.

- Athletes engaging in organized sports if they can consistently maintain social distance.

(Doc. No. 1 at Ex. 1). Plaintiffs do not qualify for any exemption under MDHHS's order.

## IV. History of the MDHHS Order and Elementary School Children

From early March to October 2020, Governor Whitmer took unprecedented unilateral executive action by issuing more than 192 executive orders, the vast majority without the support of the legislature. On March 11, 2020, Governor Whitmer issued Executive Order 2020-04, which proclaimed a state of emergency under both the Emergency Management Act (EMA), Mich. Comp. Laws § 30.403, and the Emergency Powers of the Governor Act of 1945 (EPGA), Mich. Comp. Laws § 10.31. The Executive Order identified the COVID-19 pandemic as the basis for the declaration of a state of emergency under both statutory schemes.

On October 2, 2020, the Michigan Supreme Court answered two certified questions posed by this Court. The Court clarified that the Governor no longer possessed authority under the EMA and the EPGA to continue to issue "emergency" executive orders, and any order issued after April 30, 2020 was invalid. *In re Certified Questions From United States Dist. Court , W. Dist. of Michigan, S. Div.*, No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020); *see also House of Representatives & Senate v. Governor*, No. (Mich. Oct. 12, 2020).

- 8 -

In response to the Michigan Supreme Court's October 2, 2020 decision, Governor Whitmer publicly stated that she would re-issue her unlawful orders through other means, such as through the Michigan Department of Health and Human Services. https://www.detroitnews.com/story/news/local/michigan/2020/10/02/michigan-supreme-court-strikes-down-gretchen-whitmers-emergency-powers/5863340002/ (last visited Oct. 27, 2020). Nonpublic Michigan schools, as well as many public schools, have been open in person since August 2020 without creating a new statewide emergency.

Prior to the release of *In re Certified Questions*, Governor Whitmer issued Executive Order 2020-185 that would have gone into effect on October 5, 2020 and would have required that all kindergarten through fifth grade students wear masks for the entirety of the school day, even when the young children are socially distanced at their desks.  (Doc. No. 1 at Ex. 4).

Science and data support that children of elementary school age are less likely to contract COVID-19 and are less likely to contract a serious case of COVID-19.  The Centers for Disease Control and Prevention (CDC) reports that the death rate of COVID-19 for students in the five to seventeen years-old age range is less than .1%.  *See* https://web.archive.org/web/20201020044548/https://covid.cdc.gov/coviddatatracker/#demograp hics (last visited Oct. 27, 2020).  The American Academy of Pediatrics' data supports and is consistent with that of the CDC: "Mortality (42 states and NYC reported)- Children were 0%-0.26% of all COVID-19 deaths, and 17 states reported zero child deaths.  In states reporting, 0%-0.16% of all child COVID-19 cases resulted in death."  *See* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-andcovid-19-state-level-data-report/ (last visited Oct. 27, 2020).

In Michigan, from January 1 to October 16, 2020, there has only been one death associated with COVID-19 in children ages five through fourteen. *See* https://www.mdch.state.mi.us/osr/Provisional/CvdTable2.asp?fbclid=IwAR35plM6oxH3Cg6Tn wp_9uLKn82gHyfsgnNR7TMbIuMv-09uJdund7DVaNQ (last visited Oct. 27, 2020). Executive Order 2020-185 also falsely claimed that "[g]iven the higher incidence of cases among children in recent months," the situation has amounted to an emergency requiring "the use of masks in the classroom even for younger students." (Doc. No. 1 at Ex. 4). Data and science do not support this claim. Younger students in grades K-5 have not contracted COVID-19 at a higher rate. Children in grades pre-school through fifth grade, to date, account for only approximately 2% of all COVID-19 cases reported in the schools. *See* https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_102480---,00.html (last visited Oct. 20, 2020).

Prior to the Michigan Department of Health and Human Services' now rescinded October 5, 2020 mandate, there was no statewide requirement that children in grades kindergarten through fifth grade wear masks in the classroom. Yet, the kindergarten through fifth grade age group did not contract or spread COVID-19 at a higher rate than older students or adults. *See* https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_102480---,00.html (last visited Oct. 20, 2020). The most recent data from Ingham County shows that children ages 0-9 only account for 3% of all COVID-19 cases within the county. http://www.hd.ingham.org/Portals/HD/Home/Documents/cd/coronavirus/ICHDCOVIDstats.pdf (last visited Oct. 27, 2020).

Particular to instruction of the youngest students in grades kindergarten through fifth grade, the CDC explains that facial masks present challenges, particularly for younger students

in early elementary school and students with special healthcare or educational needs, developmental or emotional disabilities, mental health conditions, or sensory concerns or tactile sensitivity.        *See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html (last visited Oct. 13, 2020).

When children are socially distanced from one another while in the classroom, CDC guidelines do not even recommend facial coverings, and it only classifies the use of facial coverings as "may be considered."    *See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html (last visited Oct. 27, 2020).  Similarly, the World Health Organization (WHO) and the United Nations Children's Emergency Fund (UNICEF) advise a multi-faceted approach to the use of masks for children from six years of age to eleven, based upon factors such as: the potential impact of wearing the mask on learning and psychosocial development in consultation with the child's teachers, parents, caregivers, and/or medical providers; the transmission rate of COVID-19 where the child resides; the ability of the child to appropriately use a facial covering; and the cleanliness and laundering of the facial covering.    *See*  https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19 (last visited Oct. 27, 2020).  The WHO and UNICEF do not recommend the use of masks on children who are five years of age.  *See* https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19 (last visited Oct. 27, 2020).

On June 30, 2020, the Governor, the COVID-19 Task Force on Education, and the Return to School Advisory Council released the Michigan Return to School Roadmap, recommending but not requiring facial coverings for young children in grades K-5.    *See* https://www.michigan.gov/documents/whitmer/MI_Safe_Schools_Roadmap_FINAL_695392_7.pdf (last visited Oct. 27, 2020).

The Michigan Return to School Roadmap described safety protocols and required schools and districts "to develop detailed district or building-level plans." *See* https://www.michigan.gov/documents/whitmer/MI_Safe_Schools_Roadmap_FINAL_695392_7. pdf (last visited Oct. 27, 2020). The Roadmap described when facial coverings were required to be worn, described safety protocol for sanitization, personal hygiene practice, and proper spacing and movement, among other health and safety protocol. The Roadmap stated that "[a]ll students in grades K-5 must wear facial coverings unless students remain with their classes throughout the school day and do not come into close contact with students in another class." https://www.michigan.gov/documents/whitmer/MI_Safe_Schools_Roadmap_FINAL_695392_7. pdf (last visited Oct. 27, 2020). On August 20, 2020, the Michigan Legislature passed, and the Governor signed, Michigan's Return to Learn law. P.A. 149, § 98a(1)(g) (Mich. 2020). Plaintiff Resurrection School were able to deliver and engage in religious education pursuant to their Resurrection School's COVID-19 Response and Preparedness Plan that complied with Return to Learn. Plaintiffs have learned, however, that they cannot comply with Defendant Gordon's MDHHS Order.

## V. Why Plaintiffs Can No Longer Follow MDHHS' Order

There is little to no identifiable benefit to requiring young children to continuously wear facial masks while the student is seated and socially distanced at his/her desk. (Resurrection Decl. ¶ 46). However, young children have exhibited that this practice is problematic. (Resurrection Decl. ¶ 46). Some young students have acted more withdrawn. (Resurrection Decl. ¶ 47). Facial masks have hindered and made communication more difficult. (Resurrection Decl. ¶ 48). Many students have been distracted during class because of their facial masks and have required re-direction. (Resurrection Decl. ¶ 49). Students who are most at risk or who

- 12 -

already harbor learning challenges appear at greater risk for experiencing difficulties with wearing facial masks. (Resurrection Decl. ¶ 50). Principal Allstott has observed students at Resurrection School drop their face masks on the ground and then put them on their faces. (Resurrection Decl. ¶ 51). In one instance, Principal Allstott observed a student drop his facemask onto the ground and then place the mask directly in his mouth. (Resurrection Decl. ¶ 51).

Despite direction on the proper handling of facial masks, young students do not possess the fine motor skills or the cognitive acuity to handle masks properly, say as a medical professional would. (Resurrection Decl. ¶ 52). When wearing facial masks for an extended period of time, young children in kindergarten through fifth grade have actually handled facial masks in a manner that appears more harmful to the spread of germs and viruses. (Resurrection Decl. ¶ 52). Having great compassion for the young students and knowing that many problems with wearing facial coverings stem from matters beyond their control, such as behavioral, emotional, or developmental reasons, Resurrection School does not believe it can discipline young students for improperly wearing facial coverings without violating their sincerely held Catholic beliefs and virtue curriculum. (Resurrection Decl. ¶ 53).

As a Catholic School, Plaintiff Resurrection School is required to act in accordance with its conscience to preserve fundamental rights and the teachings of the Gospel. CCC § 2242; (Resurrection Decl. ¶ 54). According to the Catechism of the Catholic Church, "Public authorities have the duty of guaranteeing this parental right and of ensuring the concrete conditions for its exercise." CCC § 2229; (Resurrection Decl. ¶ 56). Resurrection School does not believe, however, that conditions put in place by public authorities that distract, upset, frustrate, and disregard the behavioral, developmental, and cognitive challenges of our youngest

children in the classroom setting are "concrete."  (Resurrection Decl. ¶ 56).  The challenged order requires that ministers of Resurrection School enforce the order and/or discipline students for non-compliance with the order or face misdemeanor charges and/or fines.  (Resurrection Decl. ¶ 57).

The Governor's first facial covering requirement stated that schools were to enforce the facial covering mandate and their students through "disciplinary mechanisms." https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535121--,00.html (last visited Oct. 27, 2020).  Defendant Gordon noted that the MDHHS order follows the Governors' previous executive orders "as much as possible" in order "[t]o reduce confusion."  (Doc. No. 1 at Ex. 5).  In order to enforce and ensure compliance with the MDHHS order, Plaintiff Resurrection School is required to take enforcement and disciplinary action on its students, or face criminal or civil penalties.

Plaintiffs sincerely believe that it would not be virtuous, moral, or in line with Catholic teaching to punish and discipline a young student for not having the fine motor skills to properly handle a facial covering, for needing to remove a facial covering to engage in the educational process or breathe properly, for needing to remove a facial covering because it is hurting or distracting the child, or for removing a facial covering to better participate in religious education. (Resurrection Decl. ¶ 59, 60).

Plaintiff Resurrection School has observed that requiring facial masks in the younger grades, specifically kindergarten through fifth grade, poses pedagogical challenges of speaking and listening, distracts from the school's religious mission and virtue curriculum, and requires the school to enforce the MDHHS order on its students. (Resurrection Decl. ¶ 43).  Plaintiffs C.M., Z.M., and N.M. struggle to tolerate a facial mask.  (Resurrection Decl. ¶ 42; Mianecki

Decl. ¶ 20).   Plaintiff C.M., just in kindergarten, cannot tolerate a facial covering for longer lengths of time due to issues with her speech, as well as for developmental and health reasons. (Mianecki Decl. ¶¶ 22-28).   Plaintiff Z.M. battles with speech issues and being able to be understood.  (Mianecki Decl. ¶¶ 29-32).   Plaintiffs C.M., Z.M., and N.M. all can only tolerate facial coverings for shorter periods to time due to their young age, ability to focus, seasonal allergies, and level of fine motor skills.  (Mianecki Decl. ¶¶ 21-39).  Plaintiff F.S. suffers from breathing issues but does not qualify for a medical exemption.  (Smith Decl. ¶¶ 8-17).  The MDHHS Order makes it impossible for F.S. to attend Catholic school because F.S. cannot tolerate wearing a facial covering for an extended period of time.  (Smith Decl. ¶¶ 8-17).

Plaintiffs Mianecki, C.M., Z.M., N.M., Smith, and F.S. recognize that facial coverings have taken on a particular message and can used as a political symbol.  (Mianecki Decl. ¶ 54; Smith Decl. ¶ 29-31).   Wearing a facial covering, when socially distanced in a non-public environment otherwise focused on religious education, articulates a message is distracting to the classroom  and articulates a message with which Plaintiffs disagree.  (Mianecki Decl. ¶¶ 54-56; Smith Decl. ¶ 29).  Plaintiffs cannot continue to follow the MDHHS order without violating their sincerely held beliefs.  While safety is exceptionally important to Plaintiffs, eternal salvation holds the utmost importance.  Matthew 18:8-9; (Resurrection Decl. ¶ 64; Mianecki Decl. ¶ 61 ; Smith Decl. ¶).

## ARGUMENT

### I.      Standard for Issuing a TRO/Preliminary Injunction.

"The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Reid v. Hood*, No. 1:10CV2842, 2011

U.S. Dist. LEXIS 7631, at *4-5 (N.D. Ohio Jan. 26, 2011) (citing *Motor Vehicle Bd. of Cal. v.*

*Orrin W. Fox, et al.*, 434 U.S. 1345, 1347 n. 2 (1977)).

The standard for issuing a preliminary injunction is well established:

> In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 20 (2008) (same).  Plaintiffs satisfy each of the elements.

## II.     Plaintiffs Satisfy the Standard for Granting the Requested Injunctive Relief.

### A.     Plaintiffs' Likelihood of Success on the Merits.

The Constitution requires the government to regulate with precision.  As stated by the

Supreme Court:

> In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity.  Statutes affecting constitutional rights must be drawn with "precision," . . . and must be "tailored" to serve their legitimate objectives. . . .  And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.  If it acts at all, it must choose "less drastic means."

*Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *see also Aptheker v. Sec. of State*, 378 U.S. 500,

508 (1964) ("Even though the governmental purpose be legitimate and substantial, that purpose

cannot be pursued by means that broadly stifle fundamental personal liberties when the end can

be more narrowly achieved.  The breadth of legislative abridgment must be viewed in the light of

less drastic means for achieving the same basic purpose.") (quoting *NAACP v. Ala.*, 377 U.S.

288, 307-08 (1964)).

Here, Defendants are regulating with the blunt force of a sledgehammer rather than the precision of a scalpel.  The challenged order is unconstitutional.

### 1.    Right to Religious Exercise.

"The principle that government may not enact laws that suppress religious belief or practice is . . . well understood."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993) ("*Lukumi*").  In *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015), the *en banc* court stated:

> The right to free exercise of religion includes the right to engage in conduct that is motivated by the religious beliefs held by the individual asserting the claim. . . . The government cannot prohibit an individual from engaging in religious conduct that is protected by the First Amendment. . . .

*Id*. at 255-56.

When evaluating a free exercise claim under the First Amendment, a neutral and generally applicable law that incidentally burdens religious practices usually will be upheld.  *See Employment Div. v. Smith*, 494 U.S. 872, 878-79 (1990).  However, a "law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities.  *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020).  A law that discriminates against religious practices or beliefs usually will be invalidated because it is the rare law that can be "justified by a compelling interest and is narrowly tailored to advance that interest."  *Lukumi*, 508 U.S. at 553.  In *Lukumi*, for example, the Court struck down on free exercise grounds a law that prohibited animal sacrifice.  The law permitted some animal killings as "necessary," but deemed the ritual, religious killing of an animal as unnecessary and thus criminal, in violation of the Free Exercise Clause.  *Id*.  Under the Michigan Constitution, any law that substantially burdens religious exercise must satisfy strict scrutiny.  *Porth v. Roman Catholic Diocese of Kalamazoo*, 209 Mich. App. 630 (1995).

When evaluating Plaintiffs' free exercise claim, it is not the government's nor the Court's role to question the validity of Plaintiffs' religious convictions.  As stated by the U.S. Supreme Court, "Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981).  Consequently, Plaintiffs deeply held religious conviction that compels them to offer an education grounded in the Catholic faith (Resurrection School) or to send their children to Catholic School to receive such an education (Plaintiffs Mianecki and Smith) is beyond question by the government or this Court.  The religious conviction requiring the adoption of a virtue curriculum and disciplinary policies at the Resurrection School that honor the dignity of every student and that provide an education based upon the teachings of the Catholic faith is also beyond the function of this Court (or the government) to question.

Similarly, it is beyond question that, in accordance with the teachings of the Catholic Church, Plaintiffs have the fundamental right to educate their children at a religious school according to their faith.  Frustrating, incumbering, hindering or demanding religious education is contrary to Plaintiffs' sincerely held religious beliefs and violates their first amendment freedoms.

Consequently, it is Plaintiffs' deeply held religious conviction that requiring young children to wear masks for extended periods of time, when it is harmful or distracting for them to do so, deprives young children of their dignity and humanity.  Plaintiffs' Catholic faith teaches that we are relational beings, and our existence as relational beings points to the Holy Trinity.  It is Plaintiffs' deeply held religious conviction that requiring young children to wear masks at all

times in the classroom is disruptive to this essential element of the Catholic faith, and it is thus disruptive to the education of young children in their Catholic faith.  Plaintiffs seek to preserve its Catholic disciplinary policies and virtue curriculum without unjust interference from the state and without re-ordering or de-emphasizing what the school considers to be virtuous and important.  (Resurrection Decl. ¶ 63).  And for Plaintiff Smith and her child F.S., who suffers greatly when wearing a mask, the mandate mask has required F.S. to stay at home rather than attend Catholic school to receive the Catholic education Plaintiff Smith desires for her child pursuant to her deeply held religious convictions.

Plaintiffs believe that a kindergartener who is learning how to read a Bible verse and who struggles with her speech should be able to remove her facial covering, when at her desk and within her pod, so she can be audibly heard by the class and so she can receive help in reading and pronouncing the words correctly.  (Resurrection Decl. ¶ 59).

The challenged order allows people to remove facial coverings for many reasons, such as voting at a school, attending a public religious worship ceremony, sitting at a table at a restaurant, sitting with a group of people at a table at a bar, reciting a speech to an audience, and receiving services that require the removal of facial coverings, such as spa, tattoo, piercing and cosmetic services.  (Resurrection Decl. ¶ 60).  Learning how to read the Bible and receiving and participating in a Catholic education seems at least as important, and to practicing Catholics, much more important, than the exemptions allowed by the challenged order.  (Resurrection Decl. ¶ 61).

Consequently, in light of the numerous exceptions for facial coverings permitted for secular purposes, the challenged order is not a neutral law of general applicability and must, therefore, satisfy strict scrutiny. which it cannot.  *See Lukumi*, 508 U.S. at 547 ("It is established

in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited."). Indeed, because the government provides a general medical exemption, the First Amendment demands a general religious exemption. *See id*. In sum, "[a]ll of this requires the order to satisfy the strictures of strict scrutiny. [It] cannot." *Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) (granting a preliminary injunction and enjoining the enforcement of Kentucky's ban on "mass gatherings" during the current pandemic as applied to in-person church attendances). The challenged order violates Plaintiffs' right to the free exercise of religion.

### 2.    Right to Association.

"Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972) (citations omitted). The Sixth Circuit echoes this fundamental understanding, stating, "Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech." *Connection Distributing Co.*, 154 F.3d at 295 (citing *NAACP v. Ala.*, 357 U.S. 449, 460 (1958)). "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, *educational*, *religious*, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

As noted by the Sixth Circuit, "The Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of*

*LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004); *see also Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 119 (3d Cir. 1987) ("In one aspect, it protects an individual's choice to enter into and maintain certain intimate human relationships, which is a fundamental element of personal liberty.  Its other aspect recognizes a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.") (internal quotation marks, alterations, and citations omitted).  Indeed, "the Supreme Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Id.*  (internal quotations and citation omitted).

As stated by the Supreme Court, "state action which *may have the effect of curtailing* the freedom to associate is subject to the *closest scrutiny*."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. at 460-61 (emphasis added); *see also Anderson*, 371 F.3d at 882 ("A direct and substantial interference with intimate associations is subject to strict scrutiny. . . .") (internal quotations and citation omitted).

Here, the challenged order has the direct effect of curtailing the freedom to associate. The mask mandates adversely affect personal associations by depriving Plaintiffs of their humanity and masking their image and likeness, which were made in God's image and likeness. The masks create a false sense of fear and panic that disrupts our personal relations.  The mask mandates disrupt the associations between and among the students and teachers at the Resurrection School.  The limits on social gatherings adversely affect the nature and type of associations.  And the mandates are forcing Plaintiff Smith to keep her minor child, F.S., home

from Catholic school, thus depriving them of this association for religious and educational purposes.

As noted above, the challenged order makes multiple exemptions, but they do not exempt a non-public religious school or K through fifth grade students (who are practically immune from the disease) who attend religious schools. *City of Ladue v. Gilleo,* 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of [First Amendment activity] may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place.").

Our Constitution does not permit such an infringement of personal liberty secured by the First and Fourteenth Amendments.

### 3.    Michigan Law.

The MDHHS Order is unenforceable because Defendant lacks the authority to issue them under the Michigan Public Health Code.  The challenged order cites MCL § 333.2253 as Defendants' only authority for issuing this order.  This state law, however, authorizes a local health officer to issue an emergency order only upon finding that doing so is necessary.  More specifically, MCL § 333.2253 provides a local health officer authority to (1) prohibit a *public* gathering or (2) establish *procedures* "to insure continuation of essential public health services and enforcement of public health laws."  MCL § 333.2253.  Nothing more.  Accordingly, Defendants' order requiring masks for young children in kindergarten through fifth grade is unauthorized by state law.  Defendants' order is not an order prohibiting public gatherings (Resurrection School is a non-public, private Catholic school) nor are they procedures to insure public health services.  Instead, the challenged order is an order requiring the general public to

wear masks or face criminal prosecution.  Defendants are not authorized to issue such an order.

Michigan Public Health Laws "shall not be construed to vest authority in the department for programs or activities otherwise delegated by state or federal law or rules to another department of state government."  MCL § 333.1114.

Return to Learn legislation, passed by both houses and signed by the Governor, set forth a requirement for schools to submit its learning plan for the 2020-21 school year that included its safety protocols and methods for in person instruction.  Resurrection School submitted its plan in accordance with the law, and it was approved.

The Return to Learn legislation delegates the ultimate decision for how instruction will be received, including how facial coverings will or will not be used in the classroom during the educational process, with the school districts.  Or, in this case, with Resurrection School.

Defendants' order constitutes an attempt to undo and negate the legislature's delegation of authority to the educators over how safety protocols will be observed and implemented while achieving the pedagogical goals of the school.  This authority was not delegated to health department officials.  Defendants' order has no legal force or effect and cannot void the Return to Learn legislation or the school plans submitted and approved under this legislation.

There is no emergency upon which Defendants may act to enforce their order, and the Defendants' order does not comport with and is not authorized under the Michigan Public Health Code.[3]  In short, the challenged order is unlawful as a matter of state law.

---

[3] The MDHHS Order also ignores MCL § 333.5113(1) that allows a parent to forgo medical treatment under the Michigan Public Health Code on the grounds that the treatment violates personal religious beliefs.

4. **Fourteenth Amendment.**

a. **Right to Provide a Religious Education.**

The Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV. In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Court addressed the question of "whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment." *Id*. at 399. As stated by the Court:

> While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. . . . *The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to affect. Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive <u>but is subject to supervision by the courts</u>.*

*Id.* at 399-400 (emphasis added).

The challenged order directly infringes upon Plaintiffs fundamental right to direct the upbringing and education of their children, particularly the religious education of their children, in violation of the Fourteenth Amendment. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (stating that the challenged law "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"). Here, the mandate is forcing Plaintiffs to violate their religious beliefs and practices related to how they educate children according to the Catholic faith. Indeed, in the case of Plaintiff Smith, the

mandate is forcing her to keep her minor child (F.S.) home, thereby depriving her and her child of the right to receive a Catholic school education.

### b.      Equal Protection.

When the government treats an individual disparately "as compared to similarly situated persons and that such disparate treatment . . . burdens a fundamental right, targets a suspect class, or has no rational basis," such treatment violates the equal protection guarantee of the Fourteenth Amendment.  *Bible Believers v. Wayne Cnty.,* 805 F.3d 228, 256 (6th Cir. 2015) (internal quotations and citation omitted).  "In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotation marks omitted).

As set forth in this brief, the challenged order burdens fundamental rights (First and Fourteenth Amendments).  And, as set forth in this brief, the challenged order provides secular exemptions for undefined medical reasons, for public gatherings at polls, for public worship services, for services that require the removal of a facial covering, for sitting at a table with members of a different household at a bar or restaurant, etc.  *See supra*.  Consequently, this disparate treatment deprives Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

### c.      Right to Privacy.

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.  As well said by Judge Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." Cooley on Torts, 29.

- 25 -

*Union P. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). The U.S. Supreme Court recognizes a "right to privacy" that derives from the "penumbras, formed by emanations from" the Bill of Rights. *Griswold*, 381 U.S. 484. "There are at least two types of privacy protected by the Fourteenth Amendment: the individual interest in avoiding disclosure of personal matters, and the right to autonomy and independence in personal decision-making." *Doe v. Delie*, 257 F.3d 309, 316 n.5 (3d Cir. 2001) (internal citations omitted). As stated by the Second Circuit, "It is well established that the individual right to privacy is protected by the Due Process Clause of the Fourteenth Amendment. The privacy right takes two somewhat different forms: the right to personal autonomy (*i.e.*, the right to make certain choices free of unwarranted government interference) and the right to confidentiality (*i.e.*, the right to hold certain information private)."

The Fourteenth Amendment similarly protects against any unwanted medical treatment as an invasion of personal autonomy and bodily integrity. As the court in *Davis v. Hubbard*, 506 F. Supp. 915 (N.D. Ohio 1980), relying on well-established tort law, properly observed:

> Closely related to a person's interest in body is his interest in making decisions about his body. In the law of torts, this interest is reflected in the concept of consent. For example, in the context of medical treatment, treatment by a physician in a non-emergency that is rendered without the patient's informed consent, or exceeds the consent given, is actionable as a battery. [citing cases]. The principle which supports the doctrine of informed consent is that *only the patient* has the right to weigh the risks attending the particular treatment *and decide for himself what course of action is best suited for him*.

*Id.* at 931-32 (citations omitted) (emphasis added); *see also United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000) (quoting *Cruzan v. Director, Mo. Dep't of Health,* 497 U.S. 261, 278 (1990)) ("Because any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity, the Supreme Court has indicated that there is 'a general liberty interest in refusing medical treatment.'").

The wearing of a mask is a form of "medical treatment."  Indeed, Defendants' basis for enforcing the mandate is for medical and health reasons.  Under the mask mandate, every Michigander has become the government's "patient" and thus compelled to accept this treatment regardless of whether the person is sick, infectious, or falls within a category of persons most susceptible to the virus.  In fact, those most susceptible to this respiratory illness (*i.e.*, people with severe respiratory problems) are exempt from the mandate.

Because the mandate infringes upon Plaintiffs' fundamental right to bodily integrity, the restriction must survive strict scrutiny, which it cannot.  The exemptions for persons with respiratory issues (*i.e.*, the medical exemption) alone is fatal for the government.  *See Church of Lukumi Babalu Aye*, 508 U.S. at 547.  Moreover, compelling healthy people who have virtually no risk of contracting or spreading the virus is not necessary nor can it be considered the least restrictive means available to the government (and this is further illustrated by the fact that almost anything qualifies as a "face covering").  This is particularly true regarding the requirement that children (a demographic that is nearly immune from the virus) wear masks at all times in school even if social distancing and other safety protocols are maintained.  This is not the precision required when the government seeks to infringe upon fundamental liberties.  The challenged order fails constitutional scrutiny.

### 5. Separation of Powers and Non-Delegation Clause.

Defendants' order is unconstitutional and unenforceable against Plaintiffs because it is based on an impermissible delegation of legislative authority in violation of the Michigan Constitution.

The Separation of Powers Clause in the Michigan Constitution provides that "[t]he powers of the government are divided into three branches: legislative, executive, and judicial.

No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Mich. Const. art. III, § 2 (1963).

Article IV § 1 of the Michigan Constitution prohibits delegation of legislative power to protect the public from the misuse of power ostensibly delegated under a Michigan statute.

A delegation of power through legislation cannot be lawful if it permits executive lawmaking. If a delegation of authority to the executive branch is not sufficiently specific or fails to establish prescribed boundaries, or if the executive branch acts beyond specific boundaries in the legislation, the executive's actions are constitutionally invalid. *See In re Certified Questions From U.S. Dist. Court, W. Dist. of Mich., S. Div.*, No. 161492, 2020 WL 5877599, (Mich. Oct. 2, 2020) (striking down certain emergency executive orders issued by the Governor in response to the declared pandemic because the orders were issued in violation of the Separation of Powers and Non-Delegation Clauses of the Michigan Constitution).

Defendants' order violates the Separation of Powers and the Non-Delegation clauses of the Michigan Constitution. The provisions of the Michigan Public Health Code that Defendants rely upon to issue their emergency order fails to provide proper standards to guide or allow a proper delegation of legislative authority to the executive branch. This delegation of authority is completely open-ended and overly broad; and it permits unbridled law making by the executive branch. The statute has no temporal, durational, substantive, or legislative checks.

As interpreted by Defendants in the challenged order, the Michigan Public Health Code gives them cart blanche authority to regulate, condition, and restrict all manners of interactions in a non-public classroom, to interfere with and condition all methods and modes of religious education, and to interfere with, regulate, and condition all human interaction between students. Accordingly, Defendants' order is unenforceable. Defendants have failed to follow the Return to

learn legislation and the Michigan Public Health Code in violation of the Michigan Constitution.

**6.      Freedom of Speech.**

In *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), a case in which the government prohibited individuals from covering the State motto on their license plates, the Court held that the First Amendment is implicated when the government requires an individual to

> use their private property as a "mobile billboard" for the State's ideological message—or suffer a penalty . . . .  As a condition to driving an automobile—a virtual necessity for most Americans—the [plaintiff] must display "Live Free or Die" to hundreds of people each day.  The fact that most individuals agree with the thrust of New Hampshire's motto is not the test; most Americans also find the flag salute acceptable.  The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable.

*Id*. at 715.  Accordingly, compelled speech, such as the government's mandate to wear what has become a political symbol in a highly politicized pandemic, implicates the right to freedom of speech.  Defendants are forcing Plaintiffs to use their bodies as "mobile billboards" for their pandemic message in violation of the First Amendment.

In *United States v. O'Brien*, 391 U.S. 367, 376 (1968), a case in which the defendant was advancing a First Amendment challenge to his conviction for burning his draft card, the Court stated "that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  The Court held that the statute prohibiting the destruction of draft cards was constitutional both on its face and as applied.  *Id*. at 382.  *O'Brien* is inapposite.  It was not a compelled speech case.  It involved a statute that was designed to protect government-issued certificates that were necessary for the proper functioning of the Selective Service.  The statute did not infringe on the personal autonomy and bodily integrity of individuals.  It didn't mandate an individual to purchase or construct an item (such as

a face covering).  And as the Court noted, "We perceive no alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their willful mutilation or destruction."  *Id.* at 381.  Here, even assuming face masks are as effective as Defendants will allege, an alternative and more narrow means of accomplishing the government's alleged interest is to limit the requirement to those times when students are in common areas of the school and unable to socially distance from one another.  The mandate freely allows a person giving a speech to an audience to control his/her message by removing his/her facial covering.  It should grant the same freedom to allow a young child in the classroom at his/her desk to be able to speak and voice his/her own viewpoint without being compelled to wear a mask.  The mask mandate does not survive under *Wooley* or *O'Brien*.

### B.     Irreparable Harm to Plaintiffs without the TRO/Preliminary Injunction.

The loss of a constitutional right, "for even [a] minimal period[ ] of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns,* 427 U.S. 347, 373 (1976).  As stated by the Sixth Circuit, "when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury *is mandated*."  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (emphasis added); *see also Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*).

Because "a constitutional right is being threatened or impaired" in this case, "a finding of irreparable injury is mandated."

### C.    Whether Granting the TRO/Preliminary Injunction Will Cause Substantial Harm to Others.

In this case, the likelihood of irreparable harm to Plaintiffs is substantial.  In fact, such a finding is "mandated."  *See supra*.  Moreover, Plaintiffs are adhering to the social distancing measures recommended by the Centers for Disease Control and Prevention and other safety protocols, thereby mitigating the harm to Defendants' objectives.  Indeed, it is the government's burden to justify the challenged restrictions on Plaintiffs' fundamental liberties.  It is not Plaintiffs' burden to prove their freedom.

If Defendants are restrained from enforcing the challenged order, particularly as applied to Plaintiffs, neither Defendants nor the general public will suffer harm because Plaintiffs' activities create less of a risk of spreading COVID-19 than other similar activities expressly permitted by the order, such as the permitted social gatherings at public polling places and public worship.

In the final analysis, the irreparable harm to Plaintiffs outweighs the harm to Defendants' objectives.

### D.    The Impact of the TRO/Preliminary Injunction on the Public Interest.

As stated by the Sixth Circuit, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *G & V Lounge, Inc.*, 23 F.3d at 1079; *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) (stating that "the public as a whole has a significant interest in ensuring equal protection of the laws . . .").

As noted previously, Defendants' enforcement of the challenged order penalizes liberties protected by the United States and Michigan Constitutions.  It is in the public interest to issue the TRO/preliminary injunction.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion.

Respectfully submitted,

GREAT LAKES JUSTICE CENTER

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino
AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULES**

I hereby certify that this brief contains 9,268 words exclusive of the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, and is thus within the word limit allowed under Local Civil Rule 7.2(b)(i).  The word count was generated by the word processing software used to create this brief: Word for Microsoft Office 365, Version 1904.

GREAT LAKES JUSTICE CENTER

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

I further certify that a copy of the foregoing will be sent this day via email to the following parties or counsel who have yet to enter an appearance electronically:

Joseph Froehlich, froehlichj1@michigan.gov

Bonnie Toskey, btoskey@cstmlaw.com

GREAT LAKES JUSTICE CENTER

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino

.