UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

RESURRECTION SCHOOL,
CHRISTOPHER MIANECKI, individually
and as next friend on behalf of his minor
children C.M., Z.M., and N.M.,
STEPHANIE SMITH, individually and as
next friend on behalf of her minor child
F.S.

No.  1:20-cv-01016

HONORABLE PAUL L. MALONEY

MAG. JUDGE SALLY J. BERENS

Plaintiffs,

v.

ROBERT GORDON, in his official
capacity as the Director of the Michigan
Department of Health and Human
Services, DANA NESSEL, in her official
capacity as Attorney General of the State
of Michigan, LINDA S. VAIL, in her
official capacity as the Health Office of
Ingham County, CAROL A. SIEMON, in
her official capacity as the Ingham County
Prosecuting Attorney,

Defendants.

**BRIEF IN SUPPORT OF
DEFENDANTS DIRECTOR
ROBERT GORDON AND
ATTORNEY GENERAL DANA
NESSEL'S JOINT MOTION TO
DISMISS PLAINTIFF'S
COMPLAINT UNDER FEDERAL
RULES OF CIVIL PROCEDURE
12(b)(1), (6)**

---

Erin E. Mersino (P70886)
Thomas More Law Center
Attorney for Plaintiffs
24 Frank Lloyd Wright Dr.
P.O. Box 393
Ann Arbor, MI  48106
(734) 827-2001
Erin@greatlakesjc.org

Robert J. Muise (P62849)
American Freedom Law Center
Attorney for Plaintiffs
P.O. Box 131098
Ann Arbor, MI  48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org

Daniel J. Ping (P81482)
Joseph T. Froehlich (P71887)
Raymond O. Howd (P37681)
Assistant Attorneys General
Attorneys for Defendant MDHHS
Director Gordon
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632
PingD@michigan.gov
FroehlichJ1@michigan.gov
HowdR@michigan.gov

Bonnie G. Toskey (P30601)
Sarah Kay Osburn (P55539)
Cohl Stoker & Tosky, P.C.
Attorneys for Defendants Linda Vail and
Carol Siemon
601 N. Capital Ave.
Lansing, MI 48933
(517) 372-9000
btoskey@cstmlaw.com

Ann M. Sherman (P67762)
Deputy Solicitor General
Rebecca A. Berels (P81977)
Assistant Attorney General
Attorneys for Defendant Dana Nessel
P.O. Box 30212, Lansing, MI 48909
(517) 335-7628
ShermanA@michigan.gov
BerelsR1@michigan.gov

---

## BRIEF IN SUPPORT OF DEFENDANTS DIRECTOR ROBERT GORDON AND ATTORNEY GENERAL DANA NESSEL'S JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) & (6)

Daniel J. Ping (P81482)
Joseph T. Froehlich (P71887)
Raymond O. Howd (P37681)
Assistant Attorneys General
Michigan Dep't of Attorney General
Attorney for Defendant MDHHS
Director Gordon
P.O. Box 30736, Lansing, MI 48909
(517) 335-7632
PingD@michigan.gov
FroehlichJ1@michigan.gov
HowdR@michigan.gov

Ann M. Sherman (P67762)
Deputy Solicitor General
Rebecca A. Berels (P81977)
Assistant Attorney General
Michigan Dep't of Attorney General
Attorneys for Defendant Dana Nessel
P.O. Box 30212, Lansing, MI 48909
(517) 335-7628
ShermanA@michigan.gov
BerelsR1@michigan.gov

# TABLE OF CONTENTS

Page

Index of Authorities ................................................................................. iii

Concise Statement of Issues Presented ......................................................... x

Introduction ............................................................................................. 1

Statement of Facts ................................................................................... 4

    A.    The nature of the COVID-19 pandemic .................................................. 4

    B.    The State of Michigan's response to the COVID-19 pandemic ........... 10

    C.    Plaintiffs' complaint and procedural history ........................................ 12

Argument ............................................................................................... 14

I.    Director Gordon and Attorney General Nessel are entitled to Eleventh Amendment immunity regarding Plaintiffs' state-law claims. ...................... 14

II.    This Court should abstain from deciding any of Plaintiffs' claims. ............... 16

    A.    *Pullman* abstention ............................................................................ 16

    B.    *Thibodaux* abstention ........................................................................ 19

    C.    *Colorado River* abstention ................................................................ 20

III.    If this Court declines to abstain from exercising jurisdiction over Plaintiffs' federal claims against the State Defendants, it should dismiss them on their merits under Rule 12(b)(6). ........................................ 22

    A.    Plaintiffs' federal claims are not ripe. ................................................ 23

    B.    Plaintiffs' federal constitutional claims cannot survive *Jacobson*. ...... 25

    C.    Even absent *Jacobson*, Plaintiffs' federal constitutional claims fail as a matter of law ...................................................................... 29

        1.    Plaintiffs' free exercise claim [Count I] is without merit. .......... 29

        2.    Plaintiffs' right-to-privacy claim [Count IV] is without merit. ...................................................................................... 33

        3.    Plaintiffs' free speech claim [Count VI] is without merit. ......... 36

i

4.      Plaintiffs' free association claim [Count VII] is without
        merit. ........................................................................... 39

5.      Plaintiffs' due process claim [Count IV] is without merit. ......... 41

6.      Plaintiffs' equal protection claim [Count V] is without
        merit. ........................................................................... 42

# INDEX OF AUTHORITIES

Page

**Cases**

*Albright v. Oliver,*
  510 U.S. 266 (1994) ........................................................................................ 33

*Ammex, Inc. v. Cox,*
  351 F.3d 697 (6th Cir. 2003) ......................................................................... 24

*Antietam Battlefield KOA v. Hogan,*
  461 F. Supp. 3d 214 (D. Md. 2020) ............................................................... 38

*Armengau v. Cline,*
  7 Fed. Appx. 336 (6th Cir. 2001) ..................................................................... 4

*Armour v. City of Indianapolis,*
  566 U.S. 673 (2012) ........................................................................................ 26

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................ 23

*Bell v. Johnson,*
  308 F.3d 594 (6th Cir. 2002) ......................................................................... 33

*Bible Believers v. Wayne County,*
  805 F.3d 228 (6th Cir. 2015) ......................................................................... 43

*Bowen v. Roy,*
  476 U.S. 693 (1986) ........................................................................................ 30

*Bower v. Village of Mount Sterling,*
  44 Fed. Appx. 670 (6th Cir. 2002) ................................................................ 44

*CH Royal Oak, LLC v. Whitmer,*
  No. 1:20-cv-570, 2020 WL 4033315, at *6 (W.D. Mich. July 16, 2020) ................ 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................................................... 29, 30

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) ..................................................................................... 38, 40

*City of Houston, Tex. v. Hill,*
    482 U.S. 451 (1987) ................................................................ 17

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984) ................................................................ 36

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976) ...................................................... 19, 20, 21

*Dandridge v. Williams,*
    397 U.S. 471 (1970) ................................................................ 40

*Doe v. Mich. Dep't of State Police,*
    490 F.3d 491 (6th Cir. 2007) .................................................. 41

*Duke Power Co. v. Carolina Envt'l Study Grp.,*
    438 U.S. 59 (1978) .................................................................. 42

*Edelman v. Jordan,*
    415 U.S. 651 (1974) ................................................................ 15

*Emp't Div., Dep't of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ................................................................ 29

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ................................................................ 31

*Ernst v. Rising,*
    427 F.3d 351 (6th Cir. 2005) ............................................ 14, 15

*Ex Parte Young,*
    209 U.S. 123 (1908) ................................................................ 15

*F.C.C. v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) ................................................................ 41

*Freeman v. Michigan Dep't of State,*
    808 F.2d 1174 (6th Cir. 1987) ................................................ 15

*Geller v. de Blasio,*
    No. 20-CV-3566 (DLC), 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) .... 26, 28

*Graham v. Connor,*
    490 U.S. 386 (1989) ................................................................ 33

*Harman v. Forssenius,*
    380 U.S. 528 (1965) ................................................................ 17

*Harrison v. NAACP*,
   360 U.S. 167, 176 (1959) ................................................................ 17, 18

*In re Abbott*,
   954 F.3d 772 (5th Cir. 2020) ................................................................ 26

*In re Certified Questions*,
   ___ N.W.2d ___, 2020 WL 5877599 (Mich. Oct. 2, 2020) ...................... 17

*Jacobson v. Commonwealth of Massachusetts*,
   197 U.S. 11 (1905) ........................................................ 25, 26, 27, 28

*Ladd v. Marchbanks*,
   971 F.3d 574 (6th Cir. 2020) ................................................................ 15

*Lake Carriers' Ass'n v. MacMullan*,
   406 U.S. 498 (1972) .............................................................................. 18

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
   814 F. App'x 125 (6th Cir. 2020) .................................................. passim

*Libertas v. Whitmer, et al.*,
   No. 1:20-cv-997 (W.D. Mich.) .............................................................. 18

*Louisiana Power & Light Co. v. City of Thibodaux*,
   360 U.S. 25 (1959) .......................................................................... 19, 20

*Massachusetts Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976) .............................................................................. 43

*McGhee v. City of Flagstaff*,
   No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *2 (D. Ariz. May 8,
   2020) ...................................................................................................... 4, 39

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*,
   226 F.3d 429 (6th Cir. 2000) ................................................................ 15

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) .............................................................................. 34

*Michael v. Ghee*,
   498 F.3d 372 (6th Cir. 2007) ................................................................ 41

*Miller v. City of Cincinnati*,
   622 F.3d 524 (6th Cir. 2010) ................................................................ 43

*Mine Safety Appliances Co. v. Forrestal,*
    326 U.S. 371 (1945) ................................................................ 16

*Minnesota v. United States,*
    305 U.S. 382 (1939) ................................................................ 16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) .................................................................... 21

*Nat'l Rifle Ass'n of Am. v. Magaw,*
    132 F.3d 272 (6th Cir. 1997) ................................................. 23

*Nectow v. City of Cambridge,*
    277 U.S. 183 (1928) ................................................................ 41

*New Doe Child #1 v. Congress of the United States,*
    891 F.3d 578 (6th Cir. 2018) ................................................. 31

*New Orleans v. Dukes,*
    427 U.S. 297 (1976) ................................................................ 40

*Operation Badlaw, Inc. v. Licking Cty. Gen. Health Dist. Bd. of Health,*
    866 F. Supp. 1059 (S.D. Ohio 1992) ...................................... 35

*Pearson v. City of Grand Blanc,*
    961 F.2d 1211 (6th Cir. 1992) ............................................... 41

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................................ 14, 15

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ................................................................ 43

*Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) ................................................................ 34

*Prater v. City of Burnside, Kentucky,*
    289 F.3d 417 (6th Cir. 2002) ................................................. 30

*Radvansky v. City of Olmsted Falls,*
    395 F.3d 291 (6th Cir. 2005) ................................................. 43

*Railroad Commission of Texas v. Pullman Co.,*
    312 U.S. 496 (1941) ............................................. 16, 17, 18, 19

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008) ................................................................ 15

vi

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ................................................................. 39

*Rock v. Carney,*
    185 N.W. 798 (Mich. 1921)........................................................ 4

*Romine v. Compuserve Corp.,*
    160 F.3d 337 (6th Cir. 1998) ............................................... 21, 22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. (FAIR),*
    547 U.S. 47 (2006) ............................................................. 37, 38

*Russell v. Lundergan-Grimes,*
    784 1037 (6th Cir. 2015) ......................................................... 15

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) ................................................. 25, 26, 32

*Scarbrough v. Morgan Cty. Bd. of Educ.,*
    470 F.3d 250 (6th Cir. 2006) .................................................... 43

*Semlow Peak Performance Chiropractic v. Whitmer,*
    No. 20-206-MZ (Mich. Ct. Claims).......................................... 18, 21

*Song v. City of Elyria,*
    985 F.2d 840 (6th Cir. 1993) ..................................................... 4

*Stand Up for California! v. U.S. Dep't of the Interior,*
    204 F. Supp. 3d 212 (D.D.C. 2016) ........................................... 16

*Texas v. Johnson,*
    491 U.S. 397 (1989) ............................................................... 37

*Torres v. Precision Industries, Inc.,*
    938 F.3d 752 (6th Cir. 2019) .................................................... 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ....................................................... 30, 31

*United States v. Albertini,*
    472 U.S. 675 (1985) ............................................................... 36

*United Transp. Union v. State Bar of Mich.,*
    401 U.S. 576 (1971) ............................................................... 36

*Vacco v. Quill,*
    521 U.S. 793 (1997) ............................................................... 43

*Vance v. Bradley,*
   440 U.S. 93 (1979) ............................................................................ 42

*Vill. of Belle Terre v. Boraas,*
   416 U.S. 1 (1974) .............................................................................. 42

*Village of Willowbrook v. Olech,*
   528 U.S. 562 (2000) .......................................................................... 43

**Statutes**

Mich. Comp. Laws § 333.2253 ............................................................. 10, 17

**Other Authorities**

American Lung Association, American College of Chest Physicians, American
   Lung Association, American Thoracic Society and COPD Foundation
   Statement on Importance of Patients with Chronic Lung Disease Wearing
   Facial Coverings .......................................................................................... 8

Caitlin McCabe, *Face Masks Really Do Matter. The Scientific Evidence Is
   Growing,* Wall Street Journal .................................................................... 8

CDC, *CDC calls on Americans to wear masks to prevent COVID-19 spread* ........ 2, 38

CDC, *Considerations for Wearing Masks* ...................................................... 7, 38

CDC, *Deciding to Go Out* (June 15, 2020) .................................................... 6

CDC, *Evidence Supporting Transmission of Severe acute Respiratory Syndrome
   Coronavirus 2 While Presymptomatic or Asymptomatic* (May 4, 2020) ................. 5

CDC, *Guidance for K-12 School Administrators on the Use of Masks in
   Schools* ............................................................................................ 9, 31, 39

CDC, *Help Stop the Spread of COVID-19 in Children* (Sept. 17, 2020) ..................... 9

CDC, *Long-Term Effects of COVID-19* (Sept. 16, 2020) ............................................ 10

CDC, *Scientific Brief: Community Use of Cloth Masks to Control the Spread of
   SARS-CoV-2* (Nov. 10, 2020) ................................................................... 35

CDC, *Social Distancing, Quarantine, and Isolation* (June 12, 2020) ........................ 5

Hiroshi Nishiura, et al., *Closed Environments Facilitate Secondary
   Transmission of Coronavirus Disease 2019* (April 16, 2020) .................................. 6

Hua Qian, et al., *Indoor Transmission of SARS-CoV-2* (April 7, 2020) ..................... 6

Ingham County Health Department, *Coronavirus (COVD-19), Resources and Information*................................................................................................. 13

Mingming Liang, et al., *Efficacy of face mask in preventing respiratory virus transmission: A systematic review and meta-analysis*, 36 Travel Medicine and Infectious Disease 10175 (May 28, 2020).......................................... 9

Sarah Rahal, *Michigan shatters weekly COVID-19 case record for 5th week in a row*, Detroit News, Nov. 14, 2020.......................................................... 2

Siobhan Roberts, *Flattening the Coronavirus Curve*, New York Times (March 27, 2020) ............................................................................................ 6

Steffen Eikenberry, et al., *To mask or not to mask: Modeling the potential for face mask use by the general public to curtail the COVID-19 pandemic*, 5 INFECT DIS MODEL 293 (Apr. 21, 2020) ............................................. 8

Trisha Greenhalgh, et al., *Face masks for the public during the covid-19 crisis*, BMJ 369 (Apr. 9, 2020) .................................................................. 9

*Universal Masking to Prevent SARS-CoV-2 Transmission—The Time Is Now*, Journal of the American Medical Association ....................................... 7

World Health Organization, *Modes of transmission of virus causing COVID-19* (March 29, 2020)......................................................................... 5

## Constitutional Provisions

U.S. Const. Amend. XIV, § 1 ....................................................................... 43

**CONCISE STATEMENT OF ISSUES PRESENTED**

1.      Are the State Defendants entitled to Eleventh Amendment immunity from Plaintiffs' state-law claims?

2.      Should this Court abstain from proceeding on Plaintiffs' claims?

3.      If this Court reaches the merits of Plaintiffs' federal claims, should it dismiss them as either unripe or failing to state a claim under Rule 12(b)(6)?

## INTRODUCTION

This Court has stated that the coronavirus pandemic "needs no introduction." Indeed, in the eight months the virus has been menacing our state, the severe harms it can cause to our health and society, and the measures we must take to avert those harms, have only become clearer.  Nonetheless, as this and other cases illustrate, a small number of Michigan citizens and businesses remain committed to eschewing the best practices that Michigan's Department of Health and Human Services (DHHS) has developed and implemented in its effort to control the pandemic.  DHHS's authority in this sphere is well established and deeply rooted as a matter of state law in Michigan's Public Health Code.

To Plaintiffs, and others like them, dealing with COVID-19 is a matter of individual choice and individual consequences.  Such a worldview—thoroughly rebutted by scientific study—turns a blind eye to the immeasurable suffering imposed on all of our friends, family, and neighbors, particularly the elderly and the vulnerable, when individuals carry and spread this highly contagious pathogen throughout the community at large.  In other words, we are all, in actions and consequences in this pandemic, inescapably connected to one another. Consequently, public health measures must apply generally to everyone.  Desired carveouts cloaked in unfounded constitutional claims undercut the very social compact and aspirational "more perfect union" that is the foundation of our constitutional order.

Despite positive progress attributable to measures such as DHHS's orders, the virus remains prevalent.  In fact, it is resurging; the State of Michigan is in the

throes of a second wave.[1]  A critical tool in stopping the spread of COVID-19 is the use of face coverings.  Indeed, CDC Director Robert Redfield has stated that "[c]loth face coverings are one of the most powerful weapons we have to slow and stop the spread of the virus – particularly when used universally within a community setting.  All Americans have a responsibility to protect themselves, their families, and their communities."[2]  With this in mind, in an emergency order dated October 9, 2020, DHHS Director Robert Gordon has required that face coverings be worn by all individuals over the ages of two in a variety of public settings, including schools, and that individuals observe distancing guidelines.[3]

Plaintiffs invoke an assortment of constitutional and other legal theories to challenge this restriction, but they all boil down to the same request:  Plaintiffs ask this Court to override the judgment of the State's public health experts and act in a manner contrary to what these experts determined is necessary to protect this State and its residents.  Their request disregards the deference that is owed the executive branch's management of this public health crisis and threatens the progress made

---

[1] Sarah Rahal, *Michigan shatters weekly COVID-19 case record for 5th week in a row*, Detroit News, Nov. 14, 2020, https://www.detroitnews.com/story/news/local/michigan/2020/11/14/michigan-shatters-weekly-covid-19-case-record-5th-week-row/6295581002/.

[2] CDC, *CDC calls on Americans to wear masks to prevent COVID-19 spread*, https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html. (Ex. 1.)

[3] As discussed below, this order is no longer in effect, but it remains a basis for Plaintiffs' governing complaint.

in combating the spread of this deadly virus.  Regardless of how Plaintiffs style their request, they are not entitled to the relief they seek.

But this Court does not need to wade into the merits of Plaintiffs' claims— some of which present complicated questions regarding the interplay between Michigan's statutes and its constitution.  This Court should recognize that Director Gordon and Attorney General Nessel are immune from certain of these claims under the Eleventh Amendment.  This Court also should abstain from reaching these issues pursuant to any one of multiple abstention doctrines.  In any event, Plaintiffs' federal constitutional claims are subject to dismissal on their merits.

## STATEMENT OF FACTS

### A.       The nature of the COVID-19 pandemic[4]

The facts surrounding the COVID-19 pandemic are well-established.  SARS-CoV-2 is similar to other coronaviruses (a large family of viruses that cause respiratory illnesses), but the strain is novel.  There is no general or natural immunity built up in the population (meaning everyone is susceptible), no vaccine, and no known treatment to combat the virus itself (as opposed to treatment to mitigate its symptoms).

It is widely known and accepted that COVID-19, the disease that results from the virus, is highly contagious, spreading easily from person to person via

---

[4] The public materials cited herein should not convert this motion to one for summary judgment, because they are not inconsistent with Plaintiffs' factual allegations.  Courts evaluating motions to dismiss under Rule 12 may consider items that do "not rebut, challenge, or contradict anything in the plaintiffs' complaint."  *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993); *see also Armengau v. Cline*, 7 Fed. Appx. 336, 343–44 (6th Cir. 2001) ("[E]xtrinsic materials [that] merely 'fill in the contours and details' of a complaint . . . add nothing new and may be considered without converting the motion to one for summary judgment.").  The Court may also consider public records and matters of which it could take judicial notice.  *Armengau*, 7 Fed. App'x at 344; *Allen v. Whitmer*, Case No. 2:20-cv-11020, Order Denying Plaintiffs' Motion to Exclude Exhibits (E.D. Mich. July 10, 2020) (Ex. 2) (concluding materials of the sort offered here could be properly considered under Rule 12); *McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *2 (D. Ariz. May 8, 2020) (taking judicial notice of CDC guidance "[b]ecause government publications are matters of public record and can be easily verified."); *cf. Rock v. Carney*, 185 N.W. 798, 802 (Mich. 1921) ("[A] court may be justified in taking judicial notice that the disease is within the statute . . . .  Within reasonable bounds, at least, the health officer's conclusion that a disease is communicable, and is a menace to public health, must be conclusive . . . .").

"respiratory droplets."[5]  Experts agree that being anywhere within six feet of an infected person puts an individual at a high risk of contracting the disease.[6] Moreover, because many of those infected experience only mild symptoms, a person could spread the disease before he even realizes he is sick.[7]  Most alarmingly, a person with COVID-19 might not yet be symptomatic, but still spread the disease.[8]

Because there is no way to immunize or treat for COVID-19, the Centers for Disease Control and Prevention (CDC) have indicated that the best way to prevent illness is to "avoid being exposed."[9]  Pursuant to this advice, governmental entities have stressed the critical import of "social distancing," i.e., the practice of avoiding public spaces and limiting movement.[10]  The objective of social distancing is what has been termed "flattening the curve," that is, reducing the speed at which COVID-

---

[5] World Health Organization, *Modes of transmission of virus causing COVID-19* (March 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations  (Ex. 3.)

[6] CDC, *Social Distancing, Quarantine, and Isolation* (June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html  (Ex. 4.)

[7] CDC, *Evidence Supporting Transmission of Severe acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic* (May 4, 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article  (explaining that "[o]ne report suggested that up to 13% of infections may be transmitted during the presymptomatic period of illness") (Ex. 5.)

[8] *Id.* (noting that "an increasing number of reports have indicated that some infected persons may not exhibit signs or symptoms of illness, including persons who are presymptomatic (SARS-CoV-2 RNA is detectable before symptom onset) or asymptomatic (SARS-CoV-2 RNA is detectable but symptoms never develop)").

[9] (Ex. 4.)

[10] (*Id.*)

19 spreads.  If the disease spreads too quickly, the limited resources of our healthcare system easily could become overwhelmed.[11]

With this in mind, the CDC explained that "[i]ndoor spaces are more risky than outdoor spaces where it might be harder to keep people apart and there's less ventilation."[12]  Indeed, studies show that "sharing indoor space is a major SARS-CoV-2 infection risk."[13]  For example, one preliminary study showed that "[t]he odds that a primary case transmitted COVID-19 in a closed environment was 18.7 times greater compared to an open air environment."[14]  Additionally, the *time* in which a person spends in one place seemingly affects the rate of transmission—the CDC noted that "spending *more time* with people who may be infected increases your risk of becoming infected" and infecting others.[15]  In short, the longer an individual spends in an indoor space with others, the higher the risk of infection becomes for that individual.

---

[11] Siobhan Roberts, *Flattening the Coronavirus Curve*, New York Times (March 27, 2020), available at https://www.nytimes.com/article/flatten-curve-coronavirus.html (Ex. 6.)

[12] CDC, *Deciding to Go Out* (June 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (Ex. 7.)

[13] Hua Qian, et al., *Indoor Transmission of SARS-CoV-2* (April 7, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.full.pdf  (Ex. 8.)

[14] Hiroshi Nishiura, et al., *Closed Environments Facilitate Secondary Transmission of Coronavirus Disease 2019* (April 16, 2020), available at https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2  (Ex. 9.)

[15] (Ex. 7.)

In an editorial published in the Journal of the American Medical Association, the CDC reviewed the latest science and affirmed that cloth face coverings are a critical tool in the fight against COVID-19 that could reduce the spread of the disease, particularly when used universally within communities.[16]  Relying on case studies, the CDC confirmed that the more individuals wear cloth face coverings in public places where they may be close together, the more the entire community is protected.  "Community-level protection afforded by use of cloth face coverings can reduce the number of new infections and facilitate cautious easing of more societally disruptive community interventions such as stay-at-home orders and business closings."[17]  Accordingly, CDC guidelines make clear that everyone should wear a mask in public while keeping at least six feet away from others in order to curb the spread of COVID-19.[18]

Likewise, the American College of Chest Physicians, American Lung Association, American Thoracic Society and COPD Foundation recommend the use of masks to "to decrease the risk of spread of the virus, in particular by asymptomatic individuals who may be transmitting viral particles via respiratory

---

[16] *Universal Masking to Prevent SARS-CoV-2 Transmission—The Time Is Now*, Journal of the American Medical Association, available at https://jamanetwork.com/journals/jama/fullarticle/2768532 (Ex. 10.)

[17] *Id.*

[18] (Ex 1.); CDC, *Considerations for Wearing Masks*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html  (Ex. 11.)

droplets when they cough, sneeze, sing, talk and even breathe."[19]  In a joint statement, these leading medical groups also confirmed that individuals with normal lungs and even many individuals with underlying chronic lung disease should be able to wear face coverings without trouble.  Even the Wall Street Journal acknowledges that face coverings help reduce the transmission of droplets and help stop the spread of COVID-19.[20]  Reviewing scientific studies from around the world, the Journal stated that "researchers from around the world have found many different kinds of masks can significantly reduce the spread of coronavirus" and "[m]any researchers are also now examining the possibility that masks might offer some personal protection from the virus, despite initial thinking that they mostly protect others."[21]  Studies and epidemiological models from leading experts likewise indicate that the widespread use of masks safely and meaningfully reduces COVID-19 transmission, hospitalization, and death, especially indoors, where there is less air circulation.[22]

---

[19] American Lung Association, American College of Chest Physicians, American Lung Association, American Thoracic Society and COPD Foundation Statement on Importance of Patients with Chronic Lung Disease Wearing Facial Coverings, https://www.lung.org/media/press-releases/accp-ala-ats-copd-foundation-urge-masks-for-all  (Ex. 12.)

[20] Caitlin McCabe, *Face Masks Really Do Matter. The Scientific Evidence Is Growing*, Wall Street Journal, https://www.wsj.com/articles/face-masks-really-do-matter-the-scientific-evidence-is-growing-11595083298  (Ex. 13.)

[21] *Id.*

[22] See Steffen Eikenberry, et al., *To mask or not to mask: Modeling the potential for face mask use by the general public to curtail the COVID-19 pandemic*, 5 INFECT DIS MODEL 293 (Apr. 21, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7186508/  (Ex. 14.); Trisha

This general guidance extends to the school setting.  As the CDC has explained, while "[t]he use of masks in educational settings may present challenges, particularly for younger students and students with special healthcare or educational needs," masks remain "important to help slow the spread of COVID-19" in such settings and are "strongly encouraged" as a mitigation measure, along with other "important mitigation strategies" such as social distancing.[23]  These measures are critical to the protection of not only the children themselves, but also the many others who care for or otherwise come into contact with them.  Indeed, COVID-19 is a highly communicable disease; even if children were categorically and indisputably immune from COVID-19 symptoms, discouraging infection in children nevertheless serves to limit the spread of the virus and the manifest harm that would present to the remaining, vast majority of the population.[24]  And while the ever-mounting number of individuals killed by this virus is troubling enough, an exclusive focus on fatality rates—of children or adults—obscures COVID-19's true potential impact, which is suspected to have long-term effects on those who technically survive an

---

Greenhalgh, et al., *Face masks for the public during the covid-19 crisis*, BMJ 369 (Apr. 9, 2020), https://www.bmj.com/content/369/bmj.m1435  (Ex. 15); Mingming Liang, et al., *Efficacy of face mask in preventing respiratory virus transmission: A systematic review and meta-analysis*, 36 Travel Medicine and Infectious Disease 10175 (May 28, 2020), https://www.sciencedirect.com/science/article/pii/S1477893920302301  (Ex. 16.)

[23] CDC, *Guidance for K-12 School Administrators on the Use of Masks in Schools*, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html  (Ex. 17.)

[24] CDC, *Help Stop the Spread of COVID-19 in Children* (Sept. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/protect-children.html  (Ex. 18.)

infection.[25]  In addition to public health consequences, experience has shown significant economic effects associated with outbreaks and the presence of even a few positive cases in myriad public settings.

**B.      The State of Michigan's response to the COVID-19 pandemic**

On March 10, 2020, in response to the growing pandemic in Michigan, Governor Whitmer declared a state of emergency and invoked the emergency powers available to the Governor under Michigan law.[26]  Soon thereafter, Robert Gordon, the Director of Michigan's Department of Health and Human Services, began issuing emergency orders under Michigan's Public Health Code, Mich. Comp. Laws §§ 333.1101*, et. seq.*  Beginning on March 23, 2020 and up through the present, Director Gordon has issued numerous public orders on a number of issues related to the pandemic, including requirements regarding masks and distancing for gatherings and requirements regarding COVID-19 testing in certain contexts.[27]

On October 5, 2020, Director Gordon issued a public health order limiting gatherings of persons and requiring that face coverings be worn by all persons over the age of five in schools, with some exceptions for certain persons and activities.[28]

---

[25] CDC, *Long-Term Effects of COVID-19* (Sept. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html  (Ex. 19.)

[26] All executive orders can be found at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705---,00.html.

[27] All DHHS public health orders can be found at https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-533660--,00.html

[28] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gathering Prohibition and Mask Order dated October 5, 2020,

That order was rescinded by another public health order on October 9, 2020, which maintained the face covering requirement and served as the basis for Plaintiff's objections comprising this lawsuit.[29]

Since this lawsuit was filed, Michigan's COVID-19 crisis has worsened.  From October 1, 2020 to November 15, 2020, Michigan's per-capita case count has increased fivefold.[30]  Hospitalizations have increased over 450% during this time.[31] Although 78% more tests were being administered at the end of this same period, the rate of positive test results increased by 225%; in other words, Michigan's increased rate of COVID-19 infections can by no means be attributed only to an increased rate of testing.[32]  And, as winter approaches, the practical unavailability of outdoor gatherings will drive cases higher if Michiganders do not take action.

Accordingly, on November 15, 2020, Director Gordon issued an updated order imposing new emergency procedures to mitigate the spread of COVID-19, set to take effect on November 18, 2020 for a three-week period.[33]  The order imposes a

---

https://www.michigan.gov/documents/coronavirus/MDHHS_epidemic_order_-_Gatherings_masks_bars_sports_-_FINAL_704287_7.pdf  (Ex. 20.)

[29] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gathering Prohibition and Mask Order dated October 9, 2020, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-541962--,00.html (Ex. 21.)

[30] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gatherings and Face Mask Order dated November 15, 2020, at 1.  (Ex. 22.)

[31] *Id.* at 2.

[32] *Id.* at 1.

[33] *See generally id.*

variety of limits on gatherings, but, notably, it does not materially alter Plaintiff's obligations regarding facial coverings.[34]

### C.    Plaintiffs' complaint and procedural history

Resurrection School is a Catholic private school in Lansing, providing in-person instruction to children in grades kindergarten through fifth grade.  (ECF No. 1, Compl. ¶ 12, PageID.3-4.)  Plaintiffs Christopher Mianecki and Stephanie Smith are the parents of children who attend Resurrection School, and the minor plaintiffs to this action are their children.  (*Id*. ¶¶ 13–14, PageID.4.)  According to the complaint, the requirement that the children wear masks throughout the school day is problematic for a variety of reasons, and it interferes with the ability of the school to provide and the ability of the children to receive a religious education.  (*Id*. ¶¶ 21–83, PageID.5-13.)

Plaintiffs make much of the possible criminal penalties associated with violation of the state and county public health orders.  (*Id*. ¶¶ 84-88, PageID.3-14.) Indeed, Defendants Attorney General Dana Nessel and Ingham County Prosecutor Carol Siemon are included as defendants in this action merely because of their authority to enforce the public health orders.  (*Id*. ¶¶ 17, 19, PageID.4-5.) Importantly, however, the complaint does not allege that any law enforcement or other entity has even suggested that a violation of the public health orders is being considered against Resurrection School or the individual plaintiffs.

---

[34] *Id*.

Nevertheless, Plaintiffs contend that the Orders of the Ingham Department of Public Health and the Department of Health and Human Services violate their state and federal constitutional rights.[35]  Plaintiffs' claims attempt to invoke their rights to free exercise, freedom of association, and free speech under the First Amendment, as well as Due Process and Equal Protection.  Plaintiffs also bring claims under state law, maintaining that the Michigan Public Health Code does not permit the establishment of a mask requirement in light of other legislation related to COVID-19 and elementary schools, and that a section of the Public Health Code represents a delegation of legislative authority that violates Michigan's constitution.

After filing their Complaint, Plaintiffs sought a temporary restraining order and preliminary injunction enjoining the enforcement of the MDHHS Order and County Order requiring children in grades K through 5 to wear a mask throughout the school day.  (ECF No. 7, Pl. Mot., PageID.65.)  This Court denied Plaintiffs' motion for a temporary restraining order shortly thereafter, citing Plaintiffs' failure to demonstrate that they will be irreparably harmed absent a TRO.  (ECF No. 11, 10/30/20 Order at 3–4, PageID.207-208.)[36]  The Court reasoned that Plaintiffs have

---

[35] The Ingham Health Department rescinded its October 4, 2020 Order, noting that its "[r]equirements are in place under statewide order."  Ingham County Health Department, *Coronavirus (COVD-19), Resources and Information*, http://hd.ingham.org/DepartmentalDirectory/CommunicableDisease/Coronavirus(COVID19).aspx#8789287-ingham-county-emergency-orders  (accessed November 13, 2020).

[36] This Court's order technically did not resolve Plaintiffs' concurrent request for a preliminary injunction.  Director Gordon's response to that portion of Plaintiffs' motion is forthcoming.

"waited too long" to seek relief because some form of the face covering requirement has been in place since at least July 17, 2020 and that Resurrection had begun in-person instruction in August, well aware of the rule. (*Id.*)

## ARGUMENT

### I. Director Gordon and Attorney General Nessel are entitled to Eleventh Amendment immunity regarding Plaintiffs' state-law claims.

Under the Eleventh Amendment, Director Gordon and Attorney General Nessel (collectively, the State Defendants) are immune from suit in this Court as to the state-law claims set forth in Plaintiffs' Counts II and III. Those counts allege, respectively, that the MDHHS Orders exceed Director Gordon's authority and that, even if the Orders are authorized by state statute, the statutes themselves violate Michigan's constitution. Accordingly, the State Defendants must be dismissed as to those counts.

Sovereign immunity prevents this Court from exercising jurisdiction over Plaintiffs' claims for equitable relief under the Michigan Constitution or Michigan statutory law. "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the [s]tate that is protected by the Eleventh Amendment.*" Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Whether immunity exists in a given case is a question of constitutional law. *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005). "[B]ecause Eleventh Amendment issues are jurisdictional in nature," the State Defendants bring this portion of their motion under Federal Rule of Civil Procedure 12(b)(1). *Ladd v.*

*Marchbanks*, 971 F.3d 574, 577 n.2 (6th Cir. 2020) (quoting *Russell v. Lundergan-Grimes*, 784 1037, 1046 (6th Cir. 2015)).

The Eleventh Amendment prohibits suits naming the state or one of its agencies or departments as the defendant, regardless of the nature of the relief sought. *Pennhurst*, 465 U.S. at 100; *Ernst*, 427 F.3d at 368 ("[T]he states' constitutional immunity from suit prohibits *all* state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."). This immunity from suit extends to state officials when the lawsuit is in fact against the state. *Id.* at 101–02. Under *Ex Parte Young*, 209 U.S. 123 (1908), a federal court may issue prospective injunctive and declaratory relief compelling a state official to comply with *federal* law. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974). But that exception does not extend to such relief based on violations of state law. *Pennhurst*, 465 U.S. at 106; *Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987). This conclusion applies even if supplemental jurisdiction otherwise exists. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000). Accordingly, the State Defendants must be dismissed as to Counts II and III. [37]

---

[37] It bears noting that, while the State Defendants are not the only parties against whom Plaintiffs bring these state-law claims, the claims cannot go forward in their absence under Federal Rule of Civil Procedure 19, given Plaintiffs' inability to obtain complete relief in the State Defendants' absence, the prejudice the State Defendants would suffer from this Court proceeding on the claims without them, and Plaintiffs' ability to seek complete relief on their claims through Michigan's courts. *See, e.g.*, *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) (explaining that under Rule 19, "[a] case may not proceed when a required-entity sovereign is not amenable to suit"); *Mine Safety Appliances Co. v. Forrestal*, 326

## II.     This Court should abstain from deciding any of Plaintiffs' claims.

Given the gravity of the state law questions, the unique factual and legal landscape in which this case appears, and because at least one of the issues is currently being litigated in State court, this Court should abstain from consideration of the claims under any one of three distinct theories of abstention for the reasons that follow.

### A.     *Pullman* abstention

First, this Court should abstain from considering Plaintiffs' claims under the *Pullman* abstention doctrine.  In *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 499–500 (1941), the Supreme Court held that, when a challenged state statute requires interpretation by the judiciary, the "last word" on the meaning of the statute belongs to the state courts.  The Court held:

> In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication.  The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court.  The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

U.S. 371, 373–75 (1945) (dismissing an action where the Under Secretary of the Navy was sued in his official capacity, because the Government was a required entity that could not be joined when it withheld consent to be sued); *Minnesota v. United States*, 305 U.S. 382, 386–88 (1939) (dismissing the action for nonjoinder of a required entity where the United States was the owner of the land in question but had not consented to suit); *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 251–254 (D.D.C. 2016) (dismissing claims implicating state law given necessity of state as a defendant and inability to join it as such due to its Eleventh Amendment immunity); *Hartley Co. v. JF Acquisition, LLC*, No. 15-cv-94, 2017 WL 1628529, at *4–5 (S.D. Ohio May 1, 2017) (concluding dismissal was warranted under Rule 19 in light of state entity's assertion of sovereign immunity).

*Id.* at 500 (internal citations omitted).  In sum, "the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them." *Harrison v. NAACP*, 360 U.S. 167, 176 (1959).  This "well-established procedure" promotes and protects federalism and it "spares the federal courts of unnecessary constitutional adjudication." *Id.* at 176–77 (noting that *Pullman* abstention "is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system.").

"In cases involving a facial challenge to a statute, the pivotal question in determining whether abstention is appropriate is whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *City of Houston, Tex. v. Hill*, 482 U.S. 451, 468 (1987) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534–35 (1965)).

As this Court has already recognized, *Pullman* abstention is appropriate for the sort of claims Plaintiffs seek to raise here.  (*Libertas v. Whitmer, et al.*, No. 1:20-cv-997 (W.D. Mich.), PageID.521–23.)  The state statute at the heart of those claims—Mich. Comp. Laws § 333.2253—"has not yet been interpreted by any state court," (*Id.*, PageID.524), and Plaintiffs raise a challenge not only to its proper interpretation, but also to its compatibility with the Michigan constitution under the newly defined non-delegation doctrine set forth in *In re Certified Questions*, ___ N.W.2d ___, 2020 WL 5877599 (Mich. Oct. 2, 2020).  The task at hand thus requires

17

a nuanced application of a state-law constitutional doctrine to an uninterpreted state statute. This case presents an interpretive issue wrapped in a state-law constitutional question. These are matters duly left to Michigan's courts.

Further, a ruling by this Court on the Public Health Code would be "a tentative answer which may be displaced tomorrow by a state adjudication." *Pullman*, 312 U.S. at 499-500; *see also Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972) (affirming abstention in a case where a Michigan statute "has not been construed in any Michigan court, and, as appellants themselves suggest in attacking it for vagueness, its terms are far from clear in particulars"). At least one challenge to Director Gordon's orders currently is pending in Michigan's courts. *Semlow Peak Performance Chiropractic v. Whitmer*, No. 20-206-MZ (Mich. Ct. Claims).

Finally, abstaining would not "involve the abdication of federal jurisdiction, but only the postponement of its exercise" while "serv[ing] the policy of comity inherent in the doctrine of abstention" and "spar[ing] the federal courts of unnecessary constitutional adjudication." *Harrison*, 360 U.S. at 176–77. Indeed, the manner in which Plaintiffs' uncharted state-law questions are resolved may very well eliminate the need for any determination on Plaintiffs' federal constitutional challenges. (*Libertas v. Whitmer, et al.*, No. 1:20-cv-997 (W.D. Mich.), PageID.524.) The doctrine of constitutional avoidance counsels against this Court moving forward with federal claims that may prove purely hypothetical. *See Torres v. Precision Industries, Inc.*, 938 F.3d 752, 756-57 (6th Cir. 2019). Accordingly,

under *Pullman* abstention, this Court should refrain from reaching any of Plaintiffs'
claims.

### B. *Thibodaux* abstention

In the alternative, this Court should abstain from considering Plaintiffs'
claims under the *Thibodaux* abstention doctrine.  Although similar to *Pullman*
abstention, *Thibodaux* abstention is more concerned with the type of state law at
issue and the inherent "localness" of the issues.  *See Louisiana Power & Light Co. v.
City of Thibodaux*, 360 U.S. 25, 27–28 (1959).  The Supreme Court has advised
federal district courts to invoke *Thibodaux* abstention "where there have been
presented difficult questions of state law bearing on policy problems of substantial
public import whose importance transcends the result in the case then at bar."
*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976).

In *Thibodaux*, the Supreme Court reviewed a Louisiana district court's
decision to abstain from ruling on the constitutionality of a Louisiana state law
regarding eminent domain when the State's Attorney General and cities in the
State disagreed about the limits of eminent domain power.  360 U.S. at 30.  The
eminent domain power in question derived from a State statute that had never
before been considered by the State courts.  *Id.*  The district court stayed the case
and sought a declaratory ruling from the Louisiana Supreme Court.  *Id.*  The
United States Supreme Court affirmed the decision of the district court to abstain
reasoning that "[i]nformed local courts may find meaning not discernible to the
outsider" and that rendering a decision on the scope of the State statute may bind

the litigants in the lawsuit "whereas the rights of all other litigants would be thereafter governed by a decision of the Supreme Court of Louisiana [which could be] quite different from ours." *Id.*

In this case, this Court should defer to the Michigan State courts on Counts II and III.  Importantly, the challenged sections of the Public Health Code are related to police powers, which are inherent to the sovereignty of the State.  *Id.* at 30.  A once-in-a-century pandemic necessitates the use of these rarely invoked or reviewed State statutes, which are peculiar to the State of Michigan.  The statute at issue provides the Director power to protect Michigan residents when their health, safety, and wellbeing is threatened.  The constitutionality of that power under Michigan's non-delegation doctrine is a question best left to the Michigan courts. Indeed, the COVID-19 pandemic and the emergency powers utilized by the State to combat it "present[ ] difficult questions of state law bearing on policy problems of *substantial* public import whose importance *transcends the result in the case . . . at bar.*"  *Colorado River*, 424 U.S. at 814 (emphasis added).  This Court should abstain from exercising jurisdiction over Counts II and III under *Thibodaux*—and, given the constitutional-avoidance considerations noted above, it should likewise abstain from resolving Plaintiffs' federal constitutional challenges.

### C.   *Colorado River* abstention

Finally, this Court should abstain from considering Count II under the *Colorado River* abstention doctrine.  *Colorado River* abstention should be invoked when there is concurrent litigation on the same grounds, no matter the type of

claim at issue.  *Colorado River*, 400 U.S. at 821.  The Sixth Circuit has developed abstention factors to be considered where there is similar, concurrent litigation elsewhere:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; and (4) the order in which jurisdiction was obtained . . . (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine v. Compuserve Corp.*, 160 F.3d 337, 340–41 (6th Cir. 1998) (internal citations omitted).  "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand."  *Id.* at 341 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15–16 (1983)).

In considering the factors above, this Court should invoke *Colorado River* and abstain from deciding Count II.  There has been no action in this case other than the complaint and the resolution of Plaintiffs' *ex parte* request for injunctive relief; this case involves important matters of State police power and authority that affect *everybody* in Michigan; and the Director is a party to the concurrent litigation related to the Public Health Code Orders.  *Colorado River*, 400 U.S. at 820.

In addition, the Michigan Court of Claims has assumed its exclusive jurisdiction over the concurrent litigation,[38] and the source of governing law is state

---

[38] *See Semlow Peak Performance Chiropractic v. Whitmer, et. al.,* Michigan Court of Claims Case No. 20-206-MZ.

law.  Likewise the litigation in the Court of Claims will protect Plaintiffs' rights as the relief sought is identical to the relief sought here, and Michigan courts are the final arbiters of Michigan law.  *Romine*, 160 F.3d at 340–41.  Therefore, the factors enumerated by the Sixth Circuit, coupled with the constitutional-avoidance considerations discussed above, favor this Court abstaining from adjudicating any of the claims in this case at present.  *Id.*

COVID-19 is a once-in-a-lifetime pandemic that threatens the safety and health of every single citizen in Michigan.  To protect Michiganders, the Director used statutory emergency powers to combat the spread of the virus.  Michigan State courts already are considering the scope of those powers.  This Court should defer to the Michigan courts to avoid the possibility of inconsistent adjudications regarding matters of the utmost importance and immediacy, that would only add confusion and sow discord in the midst of an era already defined by uncertainty.

III.    **If this Court declines to abstain from exercising jurisdiction over Plaintiffs' federal claims against the State Defendants, it should dismiss them on their merits under Rule 12(b)(6).**

As discussed, the Eleventh Amendment bars Plaintiffs' state-law claims against the State Defendants in this forum.  Accordingly, although the State Defendants believe those claims lack merit and warrant dismissal as a matter of law, they will refrain from presenting those arguments here.  As also discussed, multiple strains of abstention doctrine counsel against this Court entertaining Plaintiffs' federal constitutional claims against the State Defendants on their

merits.  Should this Court nonetheless choose to reach those claims, however, it will find no cognizable claim for relief.

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). This "plausibility" review is "a context-specific task" that requires the reviewing court to determine whether the plaintiff has not just "alleged," but pleaded facts sufficient to "show[]," an entitlement to relief that is actually plausible, and not merely "conceivable" or "possible."  *Id.* at 679, 680. "[F]acts that are merely consistent with a defendant's liability" are not enough. *Id.* at 678. And in making this assessment, courts are only to consider facts that are truly well pleaded: they are not to take as true "legal conclusions," including when "couched as a factual allegation," nor "mere conclusory statements" or "naked assertions devoid of further factual enhancement."  *Id.* at 678–79 (cleaned up).

### A.    Plaintiffs' federal claims are not ripe.

Plaintiffs' claims for declaratory relief are unripe.  "Ripeness . . . is a question of timing," and "becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all."  *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997); *see id.* ("A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (cleaned up)).  Where, as here, the claims at issue arise in

23

the pre-enforcement context, the ripeness of the claims depends on: (1) whether "legal analysis [of the claims] would benefit from having [the] concrete factual context" afforded by an enforcement action; (2) "the extent to which the enforcement authority's legal position is subject to change before enforcement"; and (3) "the hardship to the parties of withholding court consideration." *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003).

Under this standard, Plaintiffs' federal claims are plainly not ripe. The challenged orders have not been enforced against the Plaintiffs, and there is no indication or allegation that enforcement is imminent. Stated differently, there is no "concrete factual context" by which this Court could measure the constitutionality of any enforcement action Plaintiffs might experience, nor any assurance or even indication that any such enforcement may even occur. And there is no hardship that might befall Plaintiffs from this Court waiting for the circumstances of enforcement to materialize, if they ever do, before attempting to adjudicate any potential claim of constitutional infringement that might o arise. There is simply nothing in this case that is "substantial" enough "and of sufficient immediate and reality" for this Court to consider at this time. *Magaw*, 132 F.3d at 284. Plaintiffs' federal claims are thus not ripe, and they warrant dismissal on that basis.

### B.   Plaintiffs' federal constitutional claims cannot survive *Jacobson.*

Plaintiffs raise a number of claims under the United States Constitution, asserting that Director Gordon's orders violated certain of their rights.

Among other deficiencies, Plaintiffs' claims cannot survive the unique historical context in which they arise and the exigent demands that attend it. Faced with "great danger[ ]," state actors are permitted great latitude to secure the public health. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905); *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (ROBERTS, C.J., concurring) (recognizing state officials' "broad" latitude in dealing with COVID-19 restrictions). As *Jacobson* and *South Bay* reflect, the Supreme Court, recognizing the separation of powers and the limits on the judiciary to invade the authority of a co-equal branch, has long refused to "usurp the functions of another branch of government" by second-guessing the executive's exercise of police power in such circumstances. *Jacobson*, 197 U.S. at 28; *see also S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (2020) (ROBERTS, C.J., concurring) (observing that state officials "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people" (internal quotations omitted)); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 127 (6th Cir. 2020) (*LIFFT*) (citing *Jacobson* and stating, "[T]he police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts.").

Since the start of the COVID-19 pandemic, courts around the country have applied *Jacobson*'s deferential standard to orders intended to combat the virus that are alleged to implicate enumerated constitutional rights.  As the Sixth Circuit has summarized, *Jacobson*'s "century-old historical principle has been reaffirmed just this year by a chorus of judicial voices, including our own."  *LIFFT*, 814 F. App'x at 127 (collecting illustrative cases, including under the First Amendment); *see, e.g.*, *S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (ROBERTS, C.J., concurring) (recognizing *Jacobson's* applicability to First Amendment free-exercise claims); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (applying *Jacobson* to substantive due process claims); *Geller v. de Blasio*, No. 20-CV-3566 (DLC), 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) (applying *Jacobson* to First Amendment speech claims challenging the restrictions on gatherings for political protests).  Thus, while the State's authority during this pandemic is not limitless, *Jacobson* mandates that courts abstain from second-guessing exercises of police power unless there is "no real or substantial relation" between its actions and public health and safety, or the restrictions are "beyond all question, a plain palpable invasion of rights."  *Jacobson*, 197 U.S. at 31.

As the Sixth Circuit has explained, overcoming *Jacobson* deference is "no easy task."  *LIFFT*, 814 F. App'x at 128.  The challenged restriction is presumed constitutional, and it is "incumbent upon Plaintiffs to negate 'every conceivable basis which might support' it" under a rational basis review.  *LIFFT*, 814 Fed. App'x at 128 (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).  "Under

this test, the [State Defendants'] action is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"— "[e]specially so . . . in the case of a public health crisis like the one presented by COVID-19, where Michigan's latitude must be especially broad." *LIFFT*, 814 Fed. App'x at 128; *see also id.* ("[T]he relevant standard merely requires rational speculation that offers conceivable support to the [Director's] order," and indeed, "the [Director] was not required to explain [the rationale] at all, let alone exhaustively" (internal quotation marks omitted)). This analysis thus requires Plaintiff to "disprove all possible justifications for the [o]rder regardless whether those justifications actually motivated the [Director]'s decisionmaking." *Id.* Furthermore, the restriction "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19." *Id.* at 129. As this Court has aptly summarized, "[u]nder *Jacobson*, the Court cannot second-guess the executive's power during a pandemic unless the executive promulgates a completely baseless rule." *CH Royal Oak, LLC v. Whitmer*, No. 1:20-cv-570, 2020 WL 4033315, at *6 (W.D. Mich. July 16, 2020) (citing *LIFFT*).

There is no viable path for Plaintiffs around *Jacobson*'s well-settled rule and the great deference it affords to the State Defendants' decisions and actions in response to this pandemic. The school mask requirement is by no means "completely baseless." *Id.* To the contrary, it plainly has a "real or substantial relation" to protecting public health during this pandemic. *Jacobson*, 197 U.S. at 31. As detailed *supra*, there is well beyond the requisite "rational speculation" to

support the conclusion that the wearing of masks, in public settings in general and in school settings in particular, constitutes an important and appropriate intervention to mitigate the spread of COVID-19.

Nor is the school mask requirement "beyond all question, a plain, palpable invasion" of Plaintiffs' rights. *Jacobson*, 197 U.S. at 31.  Plaintiffs do not allege— and cannot demonstrate—a fundamental right to mask-free schools.  And even if they could, *Jacobson* is clear that its deferential standard of review applies to alleged infringements of "*all* rights," including those "secured by the fundamental law." *Jacobson*, 197 U.S. at 26, 31 (emphasis added).  Correspondingly, courts have frequently upheld against First Amendment challenges more extreme measures taken in response to the public health needs created by the pandemic, including stay-home orders and temporary bans on *any* social gatherings. *See, e.g.*, *Geller*, 2020 WL 2520711, at *3 (declining to enjoin New York City officials from enforcing a restriction on all non-essential gatherings where the plaintiff sought to conduct a political protest and raised First Amendment speech claims).[39]

---

[39] This includes the rejection of challenges under the religion clauses of the First Amendment. *See, e.g.*, *South Bay*, *supra*; *Cavalry Chapel Dayton Valley v. Sisolak*, No. 19A1070, __ S.Ct. __, 2020 WL 4251360 (July 24, 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. June 16, 2020); *Robinson v. Murphy*, No. CV 20-5420, 2020 WL 5884801 (D.N.J. Oct. 2, 2020); *Harvest Rock Church, Inc. v. Newsom*, No. LACV206414JGBKKX, 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020); *Whitsitt v. Newsom*, No. 220CV00691JAMCKDPS, 2020 WL 4818780 (E.D. Cal. Aug. 19, 2020); *High Plains Harvest Church v. Polis*, No. 1:20-CV-01480-RM-MEH, 2020 WL 4582720 (D. Colo. Aug. 10, 2020); *Cavalry Chapel of Bangor v. Mills*, No. 1:20-cv-00156-NT, 2020 WL 2310913 (D. Maine May 9, 2020); *Cross Culture Christian Center v. Newsom*, 2020 WL 2121111 (E.D. Cal. May 5, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020).

Moreover, as discussed in greater detail below, the distancing and school
mask requirements are generally applicable and content-neutral.  Traditional
constitutional analyses of these claims confirms this application of *Jacobson*.  To the
extent that *Jacobson* does not apply, these claims nevertheless fail.  Thus, Plaintiffs
cannot articulate a constitutional violation at all—let alone a "plain" and "palpable"
violation "beyond all question."

### C.   Even absent *Jacobson*, Plaintiffs' federal constitutional claims fail as a matter of law.

#### 1.    Plaintiffs' free exercise claim [Count I] is without merit.

The Free Exercise Clause of the First Amendment to the United States
Constitution applies to the States through the Fourteenth Amendment.  *Church of
the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "The free
exercise of religion means, first and foremost, the right to believe and profess
whatever religious doctrine one desires." *Emp't Div., Dep't of Human Resources of
Oregon v. Smith*, 494 U.S. 872, 877 (1990) *overruled by statute* (1993). "The Free
Exercise Clause 'protects religious observers against unequal treatment' and
subjects to the strictest scrutiny laws that target the religious for 'special

---

In *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020), and
*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), the Sixth Circuit determined that,
despite the very deferential standard of *Jacobson*, the plaintiffs were likely to
succeed on the merits of their claims challenging a total ban on group religious
services in Kentucky.  Quite plainly, those cases are miles from this one; Director
Gordon's orders do not impose a complete ban on the exercise of fundamental
constitutional rights, and a generally applicable school mask requirement is in no
way similar, in kind or severity, to a categorical prohibition on religious gatherings.

disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017).

The Supreme Court has "long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not." *Bowen v. Roy*, 476 U.S. 693, 699 (1986). The Free Exercise Clause "cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.* But the Clause is implicated "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *City of Hialeah*, 508 U.S. at 532; *see also Prater v. City of Burnside, Kentucky*, 289 F.3d 417, 427 (6th Cir. 2002) (holding that the Clause protects the right to engage in conduct motivated by religious belief).

Thus, although laws that "target religious belief" or intentionally "infringe upon or restrict practices because of their religious motivation" raise serious constitutional concerns, "a law that is neutral and of general applicability need not be justified by a compelling government interest even if that law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531, 533. In *Trinity Lutheran*, the Court noted that "[i]n recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion." *Trinity Lutheran*, 137 S. Ct. at 2020. Indeed, neutral and generally applicable laws are presumed constitutional even when they encroach on an individual's fundamental constitutional rights.

*Employment Division v. Smith*, 494 U.S. 872, 878–79 (1990); *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 591–93 (6th Cir. 2018).

Here, there can be no dispute that slowing the spread of COVID-19 and protecting the public health is a compelling government interest.  And the school mask requirement in the Director's public health order serves that interest.  As noted, the CDC has made clear that schools present unique opportunities for spreading the coronavirus, and mitigation strategies—mask use being a critical component—are appropriate and necessary.[40]  Accordingly, the Director's order has mandated that all persons in school settings wear masks to slow the spread.

The public health justifications for requiring the wearing of masks in schools is ample and clear.  And in imposing the requirement, the order by no means "target[s] the religious for special disabilities based on their religious status."  *Trinity Lutheran*, 137 S. Ct. at 2019 (internal quotation marks omitted).  The order requires masks to be worn by children in all schools, public and private, religious and secular.  Stated differently, the mask requirement is neutral and generally applicable.

At bottom, there is nothing in the Director's order that precludes Plaintiffs' from operating their religious school consistent with their religious beliefs.  Plaintiffs simply have to operate and attend the school consistent with the order's requirement that masks be worn by all persons over the age of two.  This may be

---

[40](Ex. 17.)

less than ideal from Plaintiffs' perspective.  But it does not mean that Plaintiffs' rights have been infringed.

Plaintiffs may disagree that the mask requirement is necessary to protect the public health.  But that does not give rise to an actionable claim for relief from this Court.  As Chief Justice Roberts aptly explained when concurring in the denial of immediate relief from attendance limitations on places of religious worship, the exercise of state police power to protect the public health "is a dynamic and fact-intensive matter" that "[o]ur Constitution principally entrusts . . . to the politically accountable officials of the States".  *South Bay*, 140 S. Ct. at 1613–14 (ROBERTS, C.J., concurring).  The States' exercise of such power is not "subject to second-guessing by an unelected federal judiciary," especially where, as here, they "undertake to act in areas fraught with medical and scientific uncertainties." *Id.* (cleaned up).  As the Sixth Circuit put it:

> Shaping the precise contours of public health measures entails some difficult line-drawing.  Our Constitution wisely leaves that task to officials directly accountable to the people.
>
> *          *          *
>
> Crises like COVID-19 can call for quick, decisive measures to save lives. Yet those measures can have extreme costs—costs that are often not borne evenly. The decision to impose those costs rests with the political branches of government . . . .

*LIFFT,* 814 Fed. App'x at 129–30.

In other words, the gravamen of Plaintiffs' constitutional challenges treads on the level of policy and whether it is wise and effective.  Such a challenge is a far

cry from a plausible constitutional violation meriting the intervention of a federal

court.  Accordingly, this Court should dismiss Plaintiffs' Count I.

### 2.   Plaintiffs' right-to-privacy claim [Count IV] is without merit.

In Plaintiffs' complaint, they correctly suggest that their "religious education"

claim is subsumed by their free-exercise claim.  (ECF No. 1, Compl. ¶ 138,

PageID.23 ("The challenged orders prevent Plaintiff . . . from providing this

religious education . . . in violation of their rights to the free exercise of

religion . . . .").)  In a later brief, however, Plaintiffs frame this as a substantive due

process claim under the Fourteenth Amendment.  (ECF No. 8, Pls. Br., p. 24,

PageID.160.)  In either event, the claim fails.

At its core, this too is a free-exercise claim.  "Where a particular Amendment

'provides an explicit textual source of constitutional protection' against a particular

sort of government behavior, 'that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims.'"  *Albright v.

Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394

(1989)); *see also Bell v. Johnson*, 308 F.3d 594, 610 (6th Cir. 2002) (holding that,

after *Graham*, the First Amendment standard is the sole source of substantive

protection).  Accordingly, this claim is meritless for the same reason set forth *supra*:

the public health orders are neutral, generally applicable laws that impose, at most,

only an incidental burden on Plaintiffs' religious rights.  For that reason, rational-

basis review applies.  And the orders pass that test with flying colors.

Plaintiffs' reference to the Fourteenth Amendment should not complicate things. The sole case on which Plaintiffs rely—*Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*—entailed legislation mandating that parents send their children only to public schools. In so doing, the Court tangentially approved of reasonable regulations of general applicability, stating:

> No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

268 U.S. 510, 534 (1925). The Court also noted that "there are no peculiar circumstances or present emergencies which demand extraordinary measures relative to primary education." *Id.*

Contrary to these types of hypothetical, incidental burdens on religious exercise, *Pierce* took issue with the nature of the legislation at hand, which effectively destroyed any possibility of religious education, deeming it insufficient even under a very liberal standard: the law had "no reasonable relation to some purpose within the competency of the state." *Id.* at 535; *see also Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) (statute banning modern language instruction, other than English, violates Fourteenth Amendment because its interference had "no adequate reason . . . in time of peace and domestic tranquility"). By contrast, the school mask requirement at issue here plainly does bear the necessary relation to its purpose.

Plaintiffs frame the restrictions imposed by the orders as a violation of their rights to personal autonomy and confidentiality. (ECF No. 1, Compl. ¶ 165,

PageID.27; *see also* ECF No. 8, Pl. Br., p. 26, PageID.162.)  Although not alleged in

their complaint, Plaintiffs seem to assert that "wearing a mask is form of 'medical

treatment.' " (ECF No. 8, Pl. Br., p. 27, PageID.163.)  They further assert, without

citation to the record, that healthy people "have virtually no risk of contracting or

spreading the virus." (*Id.*)

At the outset, Plaintiffs, like many of those who object to wearing face-

coverings, misapprehend the purpose behind the requirement.  Face coverings are

primarily intended to prevent the wearer from *transmitting the virus to others.*[41]  In

this respect, the requirement is no different than a ban on smoking in public places,

which have been adjudicated immune from identical privacy-based challenges

within this Circuit.  *See Operation Badlaw, Inc. v. Licking Cty. Gen. Health Dist.*

*Bd. of Health*, 866 F. Supp. 1059, 1066 (S.D. Ohio 1992) ("The regulations . . .

dealing with smoking outside the home, and concerned primarily with the

involuntary ingestion of . . . smoke by nonsmokers, do not infringe on plaintiffs'

constitutionally-protected privacy interests"), aff'd, 991 F.2d 796 (6th Cir. 1993).

Just as public-smoking bans are not an effort to "treat" those addicted to cigarettes,

*see id.*, the facial-covering mandates are not "medical treatment" necessarily

directed to the individual wearer.  Indeed, Plaintiffs cite to no law extending their

right to privacy as far as they would have this Court extend it.  The novelty of this

---

[41] CDC, *Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2* (Nov. 10, 2020) https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html (Ex. 23.)

claim, coupled with Plaintiff's failure to support it with sufficient factual allegations, requires its dismissal. *Accord United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 583 (1971) ("We cannot accept this novel concept of equity jurisdiction that . . . would deem potential 'temptation' to be a sufficient basis for the issuance of an injunction").

### 3. Plaintiffs' free speech claim [Count VI] is without merit.

Plaintiffs' free speech claim fares no better. The Director's order is content neutral and generally applicable when it comes to expressive activity. These kinds of laws are presumed constitutional, even when they encroach on an individual's fundamental constitutional rights. *See United States v. Albertini*, 472 U.S. 675, 688 (1985). "The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." *Id.* (citing *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 296–97 (1984) ("[T]he validity of this regulation need not be judged solely by reference to the demonstration at hand."). In fact, an incidental burden on speech is permissible "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.*; *see also Clark*, 468 U.S. at 299 ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.").

And to the extent Plaintiffs are claiming that the school mask requirement is compelled speech, this claim is meritless as a matter of law.  (ECF No. 1, Compl. ¶¶ 178–79, PageID.29.)  In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, the Supreme Court asks "whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it."  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (cleaned up).  For example, allowing military recruiters on campus is not expressive conduct protected by the First Amendment.  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47, 66 (2006).  As to the military recruiting, the Court found that schools' refusal to allow recruiting on campus was expressive only because the schools' conduct was accompanied by speech.  *Id.*  But "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so *inherently expressive* that it warrants protection" as symbolic speech.  *Id.* (emphasis added).

Here, Plaintiffs maintain that the wearing of a face covering is a "symbol of oppression and government tyranny.  It is a sign that the wearer is willing to surrender his or her freedoms to the government."  (ECF No. 1, Compl. ¶ 179, PageID.29.)  But that symbolism is highly subjective and not "overwhelmingly apparent."  *FAIR*, 547 U.S. at 66 (quoting *Johnson*, 491 U.S. at 406).  As in *FAIR*, the challenged activity is not so "inherently expressive" as to communicate Plaintiffs' alleged message without some additional, explanatory speech.  As the

Supreme Court explained in *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  Courts have already rejected identical claims asserting that masks equate to speech, on the basis that masks' meaning (if any) is not overwhelmingly apparent.  *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 236 (D. Md. 2020) (citing *FAIR*, 547 U.S. at 66).

Equally unavailing is Plaintiffs' contention that they "oppose the mask mandate because science and data have shown that wearing a face mask pursuant to the mandate is not medically required or necessary, and it is harmful to the wearer."  (ECF No. 1, Compl. ¶ 179, PageID.29.)  Studies and epidemiological models from leading experts indicate that the widespread use of masks safely and meaningfully reduces COVID-19 transmission, hospitalization, and death, especially indoors, where there is less air circulation.[42]  In fact, CDC guidelines make clear that everyone should wear a mask in public while keeping at least six feet away from others in order to curb the spread of COVID-19.[43]  Similarly, schools present unique opportunities for spread of the coronavirus, and mitigation strategies—mask use being a critical component—are appropriate and necessary in all schools, whether public or private.[44]

---

[42] See note 22, *supra.*

[43]  (Exs. 1, 11.)

[44] (Ex. 17)

Plaintiffs' arguments regarding the inefficacy and dangers of masks are implausible in the face of CDC guidance, of which this Court should take judicial notice.  *See McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *2 (D. Ariz. May 8, 2020) (taking judicial notice of CDC guidance "[b]ecause government publications are matters of public record and can be easily verified.").  And regardless, as discussed, settled law forecloses Plaintiffs' attempt to convert their disagreement with the school mask requirement into an infringement of their protected rights to free speech.  Wearing a mask is not expressive activity and is a modest requirement that mitigates the risk of transmission of a potentially deadly or disabling virus.  This claim should be dismissed.

### 4.    Plaintiffs' free association claim [Count VII] is without merit.

To the extent Plaintiffs allege a violation of their right of association beyond their free exercise and free speech claims, that too is meritless.  The Supreme Court has recognized a "right of association" in certain circumstances.  In *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984), the Court noted two different sorts of "freedom of association" that are protected by the United States Constitution: one premised on the maintenance of certain intimate human relationships, and one premised on the right to engage in activities protected by the First Amendment, "speech, assembly, petition for the redress of grievances, and the exercise of religion."

Here, Plaintiffs reference "association" in the complaint, but it is unclear how a mask requirement limits one's ability to "associate" in the constitutional sense. To be sure, the complaint alleges nothing like the sort of "intimate human relationship" referred to in *Roberts*. Moreover, Plaintiffs do not identify how any of their associative activities are actually curtailed by the Director's orders. In sum, Plaintiffs identify only a hypothetical, general violation of their right to associate, which is insufficient to survive a motion to dismiss. Again, it does not create a fact question regarding the infringement of one's rights simply because one can ascribe some expressive component to one's actions. *Stanglin*, 490 U.S. at 25.

Because no fundamental right is implicated, the "freedom of association" challenge in this case is analyzed under rational-basis scrutiny, which is the most relaxed and tolerant form of constitutional scrutiny. "The rational-basis standard is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Dandridge v. Williams,* 397 U.S. 471, 485–86 (1970). "[I]t is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *New Orleans v. Dukes,* 427 U.S. 297, 303–04 (1976).

On rational basis review, the policy being challenged bears "a strong presumption of validity." *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993). "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe v. Mich.*

*Dep't of State Police,* 490 F.3d 491, 501 (6th Cir. 2007).  Under rational basis scrutiny, the plaintiff bears the burden to show that the government action "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007).

Here, for the reasons already described at length above, the requirement that masks be worn in school is designed to limit the spread of the virus.  There is an unquestionable rational basis for the requirement.  Mask wearing helps stop the spread and is constitutionally permissible under the circumstances.

### 5.     Plaintiffs' due process claim [Count IV] is without merit.

The Sixth Circuit has recognized that a substantive due process violation occurs when arbitrary and capricious government action deprives an individual of a constitutionally protected property interest.  *See Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1216–17 (6th Cir. 1992); *see also Nectow v. City of Cambridge,* 277 U.S. 183, 187–88 (1928) (holding that a court should not interfere unless the locality's action "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense" (internal quotation marks and citation omitted)).  While challenges to arbitrary and capricious government action appear most frequently in cases involving zoning and other ordinances, *see, e.g.*, *Vill. of Belle Terre v. Boraas,* 416 U.S. 1, 8 (1974), they are not necessarily limited to such cases, *see, e.g.*, *Duke Power Co. v. Carolina Envt'l*

41

*Study Grp.*, 438 U.S. 59, 82–83 (1978) (noting that federal economic regulations will be upheld "absent proof of arbitrariness or irrationality on the part of Congress" (citation omitted)).  And, as is well settled, the burden Plaintiffs must carry in advancing such a challenge is heavy.  Indeed,

> [e]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required.  The provision does not offend the Constitution simply because the classification is not made with mathematical nicety."

*Vance v. Bradley*, 440 U.S. 93, 108 (1979) (quotations, citations omitted).

Here, there was nothing illogical, arbitrary, or capricious about the Director's promulgation of the mask requirement in the public health order.  Given the characteristics of COVID-19, the mask requirement is a necessary and appropriate mitigation measure to protect the public from the rapid spread of an aggressive, as-yet untreatable, and potentially fatal disease, and to ensure this State's health care system retains the capacity and resources to manage that spread.  "The fundamental nature of an individual's interest in liberty . . . may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society."  *Salerno*, 481 U.S. at 750–51.  Such is the case here.  This count should be dismissed.

### 6.  Plaintiffs' equal protection claim [Count V] is without merit.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the

laws." U.S. Const. Amend. XIV, § 1.  The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  The States cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one person differently from others similarly situated without any rational basis for the difference.  *Id.*; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  When the disparate treatment burdens a fundamental right, strict scrutiny applies.  *Bible Believers v. Wayne County*, 805 F.3d 228, 256 (6th Cir. 2015) (en banc); *Miller v. City of Cincinnati,* 622 F.3d 524, 538 (6th Cir. 2010).  "The threshold element of an equal protection claim is disparate treatment."  *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

In typical equal protection cases, plaintiffs generally allege that they have been arbitrarily classified as members of "an identifiable group."  *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979).  When the identifiable group has not been recognized as a suspect or quasi-suspect class, courts examine the classification under rational basis review.  *See, e.g.*, *Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312 (1976).

Here, Plaintiffs do not allege that they have been arbitrarily classified into a group that has been recognized as a suspect or quasi-suspect class, or that any comparative classes were treated dissimilarly.  (ECF No. 1, Compl. ¶¶ 171–75,

PageID.28.)  As Plaintiffs conceded, their claim is therefore subject to rational basis review.  (*Id.* ¶ 173, PageID.28 ("The challenged measures lack any rational basis . . . .").)  And consistent with the general principles already discussed regarding this highly deferential level of review, "a § 1983 plaintiff's challenge to the lack of a rational basis for an equal protection claim cannot succeed 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Bower v. Village of Mount Sterling,* 44 Fed. Appx. 670, 677 (6th Cir. 2002) (citations omitted).

Plaintiffs cannot hope to shoulder their burden to negate every conceivable basis supporting the school mask requirement.  And their complaint fails to allege any facts to the contrary.  As discussed exhaustively above, the face covering requirement is a generally applicable and temporary measure that has a clear rational basis aimed at protecting the citizenry from the severe dangers posed by this pandemic.  Suppression of the virus's spread is of paramount importance, and minimization of statewide hospital resource use is necessary to ensure access to treatment.  For the reasons discussed, there can be no question that "rational speculation . . . offers conceivable support" for the mask requirement.  *LIFFT*, 814 Fed. App'x at 128.  Thus, as with Plaintiffs' due process claim, any attempt to establish an equal protection claim fails as a matter of law, necessitating dismissal of this count.

## CONCLUSION AND RELIEF REQUESTED

With or without a pandemic, public health requirements can be controversial. The wisdom and efficacy of policy decisions are—and should remain—up for serious debate.  It would be legal error, however, to conflate that debate with novel and unfounded theories about the unconstitutionality of the Public Health Code. Constitutionalizing those issues extends the judicial function beyond its proper zone of competence and control.  Other authority gets to select the tools from that policy-making toolbox and decide how to use them.  More fundamentally, this Court should decide as a matter of both immovable jurisdiction and discretionary abstention that it should not intervene here.

Defendants DHHS Director Robert Gordon and Attorney General Dana Nessel respectfully request that the Court dismiss them from Plaintiffs' state-law claims and abstain from exercising jurisdiction over Plaintiffs' lawsuit or, in the alternative, dismiss Plaintiffs' federal claims and grant the Defendants such and further relief as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
Joseph T. Froehlich (P71887)
Raymond O. Howd (P37681)
Assistant Attorneys General
Michigan Dep't of Attorney General
Attorney for Defendant MDHHS
Director Gordon
P.O. Box 30736, Lansing, MI 48909
(517) 335-7632
PingD@michigan.gov
FroehlichJ1@michigan.gov

45

/s/ Ann M. Sherman
Ann M. Sherman (P67762)
Deputy Solicitor General
Rebecca A. Berels (P81977)
Assistant Attorney General
Michigan Dep't of Attorney General
Attorneys for Defendant Dana Nessel
P.O. Box 30212, Lansing, MI 48909
(517) 335-7628
ShermanA@michigan.gov
BerelsR1@michigan.gov

## PROOF OF SERVICE (E-FILE)

I hereby certify that on November 18, 2020, I electronically filed the foregoing

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic notice and copies of such filing of the following to the parties:

- Brief in Support of Defendant Director Robert Gordon and Attorney General Dana Nessel's Joint Motion to Dismiss Plaintiff's Complaint Under Fed. R. Civ. P. 12(b)(1) & (6)

A courtesy copy of the aforementioned document was placed in the mail

directed to:  Judge Paul L. Maloney, 137 Federal Bldg., 410 W. Michigan Ave.,

Kalamazoo, MI  49007.

/s/ Daniel J. Ping
Daniel J. Ping (P81482)
Assistant Attorney General
Michigan Dep't of Attorney General
Attorney for Defendant Director Gordon
P.O. Box 30736
Lansing, MI  48909
(517) 335-7632
pingd@michigan.gov

46