IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RESURRECTION SCHOOL; CHRISTOPHER MIANECKI, individually and as next friend on behalf of his minor children C.M., Z.M., and N.M.; and STEPHANIE SMITH, individually and as next friend on behalf of her minor child F.S., Plaintiffs,<br><br>v.<br><br>ROBERT GORDON, in his official capacity as the Director of the Michigan Department of Health and Human Services; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan; LINDA S. VAIL, in her official capacity as the Health Officer of Ingham County; and CAROL A. SIEMON, in her official capacity as the Ingham County Prosecuting Attorney, Defendants. | Case No. 1:20-cv-1016<br><br>**FIRST AMENDED COMPLAINT**<br><br>Honorable Paul L. Maloney |

Plaintiffs Resurrection School, Christopher Mianecki, individually and as next friend on behalf of his minor children C.M., Z.M., and N.M., and Stephanie Smith, individually and as next friend on behalf of her minor child F.S. (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

**INTRODUCTION**

1.      Plaintiff Resurrection School cares deeply about its students—their physical health, their educational and physical development, their spiritual health, and their growth in virtue and knowledge of the Catholic faith. As such, Resurrection School partners with parents to achieve these aims and to integrate the Catholic faith into all portions of the school day.

- 1 -

2.      Since the beginning of the COVID-19 pandemic, Plaintiff Resurrection School has taken health precautions seriously and closely followed the developing science regarding COVID-19 and effective safety measures. Over the summer, Resurrection School developed comprehensive health protocols, at times exceeding those required by the state, so that it would be able to reopen for in-person schooling in the Fall, in accord with the desires of its school parents.

3.      Resurrection School's COVID safety plan at the beginning of the school year, required masks in the classroom and in indoor common areas at all times for teachers and students in grades 6 – 8; however, consistent with the state requirements at the time, in recognition of the difficulties that masks present for the spiritual, emotional, and physical development of younger students, Resurrection School did not require masks for its students in grades K – 5 when seated in the classroom.

4.      In late September, Governor Whitmer announced a revision to her existing mask mandate, requiring that all students, regardless of grade, wear masks at all times in the school. Neither the Governor nor the Michigan Department of Health and Human Services have identified a reason for this change. Plaintiff Resurrection school believes there is no sound basis for the K -5 mask mandate: cases, hospitalizations, and deaths in Michigan remained stable throughout August and September, even as schools reopened; and according to the state's own data, only 0.01% of Michigan students were infected with COVID-19, meaning that it was not significantly contributing to community spread. This was particularly so with students in the younger grades.

5.      The relief Plaintiffs seek is in this First Amended Complaint is narrow: an order providing that when K-5 students are seated and socially distanced at their desks, they may engage in Catholic education without being forced to wear a mask.

## BACKGROUND

6.      Since the beginning of March 2020, Michigan Governor Gretchen Whitmer has exercised control over almost all areas of life.  From March through the filing of the original Complaint in October, the Governor has issued **one hundred and ninety-two** executive orders, citing the spread of COVID-19 as justification for this extraordinary exercise of authority.  The Michigan Supreme Court has since held the majority of the Governor's orders unconstitutional under the Michigan Constitution, noting the "sweeping scope" of her policies and that her actions "rest[ed] on an assertion of power to reorder social life." *In re Certified Questions From U.S. Dist. Court, W. Dist. of Mich., S. Div.*, No. 161492, 2020 WL 5877599, at *15 (Mich. Oct. 2, 2020) (hereinafter "*In re Certified Questions*").

7.      The Michigan Supreme Court expressed hope that its "decision leaves open many avenues for the Governor and Legislature to work together to address this challenge and we hope that this will take place." *Id.* at *3, n.1; *see also House of Representatives & Senate v. Governor*, No. (Mich. Oct. 12, 2020) ("It should again be emphasized . . . that our decision today, like our decision in *In re Certified Questions*, leaves open many avenues for our Governor and Legislature to work together in a cooperative spirit and constitutional manner to respond to the COVID-19 pandemic."). Unfortunately, Governor Whitmer and the Defendants have ignored this direction and continue to mandate unilateral and intrusive orders that "reorder social life" and claim that an "emergency" requires their issuance. *See In re Certified Questions* at *15.

8.      Plaintiffs filed this lawsuit to save the private, Catholic elementary school classroom from **unnecessary** reordering.

9.      Plaintiffs—like students and schools from across the state—have engaged in in-person classroom education since August of 2020, with extensive health and safety protocols in place. Pursuant to the Return to Learn legislation passed by both houses of the Michigan legislature and

signed by the Governor, Plaintiffs operated under its approved plan for approximately two months, successfully deterring the spread of COVID-19 in their small, religious school.  Under government required COVID safety protocols, the school required masks for all teachers, required masks for students in grades 6 to 8, required masks for all students when outside the classroom, required social distancing, promoted handwashing, and regularly disinfected surfaces.  Plaintiff Resurrection School even went beyond the government-required protocols and installed air purification systems and kept students socially distant from one another by grouping into cohorts of students and, within each cohort, to pods of students.  Now, however, citing emergency authority, Defendants are elevating the in-class student-masking requirement which had previously been limited to grades 6 and up, making it mandatory for the lower grades ("K-5 mask mandate"), regardless of whether the children are safely distanced from one another and regardless of how the mandate affects the children's ability to learn or fully engage in religious education. Additionally, Defendants are extending their masking requirement without citing any evidence that children in grades K-5 were spreading COVID in the schools or that masking is effective on children in the younger grades. In fact, the state's own data— received via FOIA—shows only .01% of all Michigan students were infected with COVID at the time of the new mandate.  By extending the in-class mask requirement to grades 5 and below, Defendants' orders *add up to seven additional hours of continuous masking for students as young as five years old each day.*

10. This civil rights action is brought under the First, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Michigan Constitution, challenging Defendants' orders mandating the wearing of masks, as set forth in this First Amended Complaint.

11. Plaintiffs seek a declaration that the enactment and enforcement of the challenged orders violate their fundamental rights secured by the United States and Michigan Constitutions and

an order enjoining the same.  Plaintiffs also seek an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and other applicable laws.

**JURISDICTION AND VENUE**

12.     This action arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

13.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex parte Young*, 209 U.S. 123 (1908), and by the general legal and equitable powers of this Court.

14.     Plaintiffs' claim for an award of their reasonable costs of litigation, including attorneys' fees and expenses, is authorized by 42 U.S.C. § 1988 and other applicable law.

15.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and all Plaintiffs and Defendants reside or conduct business in this District.

**PARTIES**

16.     Plaintiff Resurrection School is a small, Catholic, non-public school located in Lansing, Michigan.  Resurrection School serves elementary school-aged children in grades kindergarten through eighth grade.  Resurrection School is led by and is a ministry of the Church of the Resurrection, a Catholic church within the Diocese of Lansing, Michigan.  Plaintiff Resurrection School follows and teaches according to the Catholic faith.

17.     Plaintiffs C.M., Z.M., and N.M. are all students at Resurrection School.  C.M. is a kindergartner, Z.M. is a third grader, and N.M. is a fifth grader.  Plaintiff Christopher Mianecki is an adult citizen of the United States, a resident of Michigan, and the father of Plaintiffs C.M., Z.M., and

- 5 -

N.M.  Plaintiff Mianecki brings this action individually and on behalf of his minor children C.M., Z.M., and N.M., as their next friend.

18.    Plaintiff F.S. is a fourth grader in the Diocese of Lansing.  Plaintiff Stephanie Smith is an adult citizen of the United States, a resident of Michigan, and the mother of F.S.  Plaintiff Smith brings this action individually and on behalf of her minor child F.S., as her next friend.

19.    Defendant Richard Gordon is the Director of the Michigan Department of Health and Human Services.  In his official capacity, Defendant Gordan has issued several emergency orders requiring masking in the schools since the beginning of October 2020, the latest being issued on December 7, 2020 ("MDHHS Orders").  (*See* https://www.michigan.gov/documents/coronavirus/Masks_and_Gatherings_order_-_12-7-20_709796_7.pdf) last visited Dec. 8, 2020.

20.    Defendant Gordan is sued in his official capacity.

21.    Defendant Dana Nessel is the Attorney General of Michigan.  As the Attorney General, Defendant Nessel has the authority to enforce the challenged orders set forth in this First Amended Complaint.  Defendant Nessel is sued in her official capacity.

22.    Defendant Linda S. Vail is the Health Officer for the Ingham County Health Department.  Defendant Linda S. Vail is responsible for the enforcement of the MDHHS Orders pursuant to MCL 333.2433(1)(2)(a).  Defendant Vail is sued in her official capacity.

23.    Defendant Carol A. Siemon is the Ingham County Prosecuting Attorney.  Defendant Siemon is responsible for criminally prosecuting the challenged orders set forth in this First Amended Complaint.  Defendant Siemon is sued in her official capacity.

## STATEMENT OF FACTS

### Resurrection School

24.     Resurrection School is a Catholic school that has adopted a curriculum and disciplinary policies that honor the dignity of every student, and it provides an education based upon the teachings of the Catholic faith.

25.     In accordance with the teachings of the Catholic faith, Resurrection School believes that every human has dignity and is made in God's image and likeness.  As the Catholic faith teaches, humans are relational beings called to love God and neighbor. By fulfilling the two greatest commandments to love God and our neighbor, Catholics, like all Christians, hope one day to see God face to face. Here on earth, where they learn to love and prepare to see God, Catholics are called to love others as themselves, and to see Christ in the "least of these." Seeing others in their need and condition helps us know what love demands. Jesus made seeing the other a priority. When talking with the Pharisees, Jesus asked them in Luke 7, "Do you see this woman . . ." For Jesus, and for us, seeing the other in his or her wholeness and his or her need helps us know how best to give and receive love as God loves. In this, our human experience is patterned after the Holy Trinity—the Father, the Son, and the Holy Spirit—who eternally give and receive love.  Looking at a person's face or their countenance helps us see and understand them. The face is the way we best recognize others. It reveals the distinctiveness of our person and personality. Facial expressions convey thoughts and emotions such as joy, fear, hopes, anxiety. Facial expressions also provide cues to levels of disengagement or engagement.

26.     Wearing masks makes it significantly more difficult to see the countenance of others, to detect their emotions, their engagement, interest, puzzlement and/or concerns. Masks also make it more difficult to hear voices, which is another fundamental way that intellectual, emotional and/or spiritual concerns are expressed. As such, masks are disruptive of the essential, relational aspects of

- 7 -

human intercourse. They make it more difficult to "see" and "hear" the other in his or her emotional and affective state. In these ways, masks make it more difficult to freely and effectively see, know, and love others.  Plaintiffs share these deeply held religious beliefs.

27.     Resurrection School seeks to instill confidence in its students and encourage social interactions that replicate the life and teachings of Jesus Christ.

28.     Resurrection School seeks to impart the virtue of mercy through actions of forgiveness.  For example, when a student has wronged or hurt another student, a teacher guides the student through the reconciliation process and facilitates a face to face apology with the student who was harmed.  A mask interferes with this important human interaction—an interaction that is essential to the spiritual well-being of the students.  Additionally, masks interfere with a student's ability to know that he has wronged a fellow student, as it is often the other's facial expression that best communicates a student's hurt feelings or injury.

29.     Resurrection School sees moments of conflict, whether working on a difficult concept, struggling with reading or a complex math concept, or disagreement between students, as moments to evangelize.

30.     Resurrection School is devoted to helping all students, especially students who inspire others through persisting and learning with exceptionalities, such as learning disabilities, an extra twenty-first chromosome, or setbacks from a troubled childhood.

31.     Resurrection School is proud of instilling the love and wonder of a Catholic, classical curriculum and guiding its students in a multi-disciplinary approach that infuses the Catholic faith into as many facets of the students' day as possible.

32.     The students are the focus and reason for the existence of Resurrection School.  The faculty works for the betterment, education, and divinization of their students, as the ultimate goal of Catholic education is to prepare each child to become a Saint.

33.     Resurrection School partners with the students' parents, who are the first educators of their children according to the Catechism of the Catholic Church.  Accordingly, Resurrection School listens to parents in its school community, and it strives to give voice and the appropriate authority to them.

34.     The Resurrection School parent community, in large measure, deeply disagrees with and objects to Defendants' orders that require their children to cover their faces while engaged in the process of learning, even while socially distanced in the classroom.

35.     Plaintiffs seek to take responsible measures to ensure health and safety.  However, they also desire normalization, friendship, an enriching education, and a healthy spiritual life.

**Plaintiffs Mianecki and C.M., Z.M., and N.M., and Plaintiffs Smith and F.S.**

36.     Plaintiff C.M. is a kindergartner at Resurrection School.

37.     Plaintiff Z.M. is a third grader at Resurrection School.

38.     Plaintiff N.M. is a fifth grader at Resurrection School.

39.     Plaintiff F.S. is a fourth grader in the Diocese of Lansing.

40.     As part of their religious exercise, Plaintiffs Mianecki and Smith wants their respective children, C.M., Z.M., N.M., and F.S., to receive a Catholic education.  As the persons who have the paramount right to direct the education of their children pursuant to the Catechism of the Catholic Church, including the religious education of her children, Plaintiffs Mianecki and Smith have chosen Catholic schools for their children.

41.     Plaintiff Smith has chosen to send her son to Catholic school where F.S. can receive the education Plaintiff Smith desires for her son.

42.     Plaintiff Mianecki has chosen Resurrection School as the place where C.M., Z.M., and N.M. can receive the Catholic education he sees as instrumental for his children's religious and educational formation.

43. Plaintiff F.S. has suffered from breathing issues since he was an infant, in part due to severe allergies.

44. Plaintiff F.S.'s parents, including Plaintiff Smith, have taken F.S. to receive medical care throughout his childhood. Plaintiff F.S. is highly susceptible to respiratory infections that quickly turn into additional infections such as bronchitis.

45. Plaintiff F.S.'s family moved into a home with radiant heat to help F.S. with his breathing and health issues.

46. When the government began mandating the wearing of masks outside the home, Plaintiff Smith discussed with F.S.'s pediatrician whether F.S. qualified for a medical exemption. His pediatrician determined, that while F.S. does suffer from breathing issues, allergies, and health complications, he did not satisfy the requirements to obtain a medical exemption.

47. Plaintiff F.S. can only tolerate a mask for a short period of time.

48. Upon wearing a mask for more than thirty minutes, Plaintiff F.S. has difficulty breathing. Consequently, he constantly pulls at his mask, often removing it from his nose and mouth.

49. Plaintiff F.S. cannot wear a mask beyond thirty minutes without being distracted by it.

50. Plaintiff F.S.'s parents, including Plaintiff Smith, had to remove F.S. from the classroom due to the challenged orders because F.S. cannot tolerate wearing a mask.

51. Wearing a mask in the classroom makes it impossible for Plaintiff F.S. to receive a religious education.

52. Plaintiff F.S. wishes to return to the classroom with his classmates, and Plaintiff Smith wants F.S. to return. However, the challenged orders mandating the wearing of masks make it impossible for F.S. to do so.

53.     Plaintiff F.S.'s parents, including Plaintiff Smith, paid tuition for the 2020-21 school year based upon the initial safety plan put in place by the Diocese of Lansing in accordance with the Return to Learn legislation.  Plaintiff Smith is currently paying for a religious education for her son that he cannot receive because he has to be educated at home where he is not required to wear a mask. Also, Plaintiff Smith is unable to provide the religious education that attending a Catholic school provides.

54.     The challenged orders single out children who cannot tolerate masks, making them unable to participate in religious education.

55.     Plaintiff Mianecki moved his wife and family to Lansing, Michigan and specifically chose for his children, Plaintiffs C.M., Z.M., and N.M., to attend and receive their religious education and formation at Resurrection School.

56.     At the start of the school year in August 2020, Plaintiffs C.M., Z.M., and N.M. were beginning to engage in Catholic fellowship with their classmates and form relationships with other children based upon the teachings and example of Jesus Christ.  Mandating Plaintiff Mianecki's young children to wear facial coverings is hindering the formation of these bonds and prevents the body of Christ from freely associating.

57.     Kindergartner, Plaintiff C.M., is particularly shy and quiet around those she does not know well.  Wearing a facial covering impedes her ability to be heard, to socialize, to engage in religious fellowship, and it impedes her ability to acclimate to new surroundings and new people. Plaintiff C.M.'s teacher has voiced that Plaintiff C.M. is quiet in the classroom.

58.     Plaintiff C.M. experiences difficulty and concerning discomfort when wearing a facial covering.

59.     Plaintiff C.M. has large tonsils and a sensitive gag reflex which lowers her tolerance for wearing a facial covering for any extended period of time.

60.     Plaintiff C.M. does not possess the fine motor skills to handle a facial covering properly due to her age.  It is difficult for Plaintiff C.M., a kindergartner, to keep the facial covering clean or even from falling onto the floor.

61.     Plaintiff C.M.'s inability to properly handle a facial covering creates an increased likelihood that bacteria and viruses could present on the facial covering or on Plaintiff C.M.'s hands and skin.

62.     Plaintiff C.M. has difficulty with speech and has trouble pronouncing certain letters correctly.  Wearing a facial covering exacerbates her struggles with speech and impedes her teacher's ability to see her mouth to determine if her mouth is in the proper position to say letters and sounds correctly.

63.     Plaintiff Z.M. also battles with speech problems.

64.     Plaintiff Z.M. has clinically recognized speech issues.  He has been monitored and aided by speech therapists for several years.

65.     Plaintiff Z.M.'s speech is difficult to understand, sometimes even for individuals who know him well.

66.     For Plaintiff Z.M., wearing a facial covering impedes his ability to be heard and to be understood by others in the classroom, including his teacher.

67.     Plaintiffs C.M., Z.M., and N.M. struggle with focus.  Facial coverings cause C.M., Z.M., and N.M. distraction, further causing them to touch their faces and their facial coverings frequently.

68.     Plaintiff Mianecki has observed Plaintiffs C.M., Z.M., and N.M. wearing facial coverings for short periods of time at Catholic Mass.

69.     When wearing facial coverings, Plaintiffs C.M., Z.M., and N.M struggle to engage in and celebrate the Mass.  Plaintiffs C.M., Z.M., and N.M. fiddle with their facial coverings, take

them off and then put them back on improperly, and lose attention and focus on what is around them. Plaintiffs C.M., Z.M., and N.M. have more trouble than usual paying attention during Mass.  Indeed, the facial coverings make it practically impossible for them to do so.  The same is true in the classroom.  Wearing a mask diverts Plaintiffs C.M., Z.M., and N.M.'s attention away from the lesson taught in class.

70.     Plaintiffs C.M., Z.M., and N.M. suffer from seasonal allergies for which they take medication.  The medication, however, does not eliminate all of their symptoms.

71.     Facial coverings negatively affect Plaintiffs C.M.'s, Z.M.'s, and N.M.'s ability to breathe effectively.

72.     Plaintiff Mianecki has observed that after his children wear facial coverings, even on a very limited basis, the coverings have felt wet from saliva and allergy related sneezing or coughing.

73.     The breadth and scope of the challenged orders are excessive.  Indeed, the orders would make it a crime for F.S., C.M., Z.M., and N.M. to meet with a friend from a different household outside of school hours to play if they did not wear a mask and even if they were meeting in the privacy of their own homes.

74.     The challenged orders similarly place burdens upon Plaintiff Smith's and Plaintiff Mianecki's ability to associate with others, whether for family gatherings, religious purposes, or other social reasons by limiting the size of these associations and by requiring the wearing of masks.

75.     Upon information and belief, no peer reviewed studies exist demonstrating the effectiveness of non-medical facial coverings for children.

76.     Upon information and belief, the state lacks any data to support its extension of the mask mandate to grades K-5, i.e., the state lacks any evidence that in the months of August and September the lack of masks in grades K-5 were contributing to community spread of COVID-19.

Quite the contrary, infection rates in Michigan schools were exceedingly low at this time with 0.01% of all students infected; upon information and belief, even fewer infections were spread in the younger grades.

77.     There have been no peer reviewed studies concerning how sanitary it is for young children, given their motor skills development, to wear non-medical facial coverings.

78.     There are known inter-personal, cognitive developmental, and pedagogical benefits to seeing a person's face and not having a student's face covered, especially while learning and communicating in a classroom setting.

79.     Methods that strive to promote safety but have a deleterious effect on a child's social and emotional development do not promote the health and well-being of the whole child as Catholic social teaching strives to do.

80.     It seems that Defendants understand that wearing a mask affects communication and the message a speaker portrays as it exempts a speaker from wearing a mask when the speaker is talking         to         an         audience         at         least         six         feet         away. https://www.michigan.gov/documents/coronavirus/Masks_and_Gatherings_order_-_12-7-20_709796_7.pdf (last visited Dec. 8, 2020).  However, since Defendants refuse to exempt Plaintiffs, that speaker cannot be a K-5 student and that audience cannot be classmates.

81.     The mask mandate communicates that K-5 children, even when over six feet away, seated, and learning, are constantly at risk and potentially pose a threat to one another.  The mask mandate contributes to a sense of insecurity by communicating that all people are potentially dangerous because they could well be carrying a disease.  This affects the operation and comfort level of the classroom.  The mask mandate affects young children who are still forming their impressions of the world.

82.     A mask is required for everyone, even though the vast majority of individuals required to wear one are healthy or are not in a group with a high risk of contracting COVID-19, such as kindergarten through fifth grade students.

83.     The mask mandate extending even into the conduct and discipline required in the religious classroom, creates the implication that private citizens must rely on the government for the direction of how they may learn and be spiritually formed and, thereby allow Defendants to have power and authority over even the most private aspects of religion, education, and life.

## Defendants Criminalize Gatherings and Not Wearing Masks, Even When Socially Distanced and Seated at Desks in the Classroom

84.     From early March to October 2020, Governor Whitmer took unprecedented unilateral executive action by issuing more than 192 executive orders, the vast majority without the support of the Legislature.

85.     On March 10, 2020, Governor Whitmer issued Executive Order 2020-04, which proclaimed a state of emergency under both the Emergency Management Act (EMA), Mich. Comp. Laws § 30.403, and the Emergency Powers of the Governor Act of 1945 (EPGA), Mich. Comp. Laws § 10.31.  The Executive Order identified the COVID-19 pandemic as the basis for the declaration of a state of emergency under both statutory schemes.

86.     On October 2, 2020, the Michigan Supreme Court answered two certified questions posed by this Court.  The Court clarified that the Governor no longer possessed authority under the EMA and the EPGA to continue to issue "emergency" executive orders, and any order issued after April 30, 2020 was invalid.  *In re Certified Questions From United States Dist. Court , W. Dist. of Michigan, S. Div.*, No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020); *see also House of Representatives & Senate v. Governor*, No. (Mich. Oct. 12, 2020).

87.     In response to the Michigan Supreme Court's October 2, 2020 decision, Governor Whitmer publicly stated that she would re-issue her unlawful orders through other means, such as

through the Michigan Department of Health and Human Services and local health departments, such as the Ingham County Health Department.

88.     Nonpublic Michigan schools, as well as many public schools, have been open in person since August 2020.  Since opening and to the date of this filing, circumstances have not substantiated any emergency action within the kindergarten through fifth grade student population. Indeed, the state's own data shows that infection rates in schools remained exceedingly low in Michigan schools in August and September. This is consistent with studies from around the world which have shown that schools, particularly elementary schools, have not significantly contributed to community spread of COVID-19.

89.     Despite this fact, the Governor issued Executive Order 2020-185 that would have gone into effect on October 5, 2020 and would have required that all kindergarten through fifth grade students wear masks for the entirety of the school day, even when the young children are socially distanced at their desks.

90.     Executive Order 2020-185 was not reasonable or necessary.

91.     Executive Order 2020-185 misleadingly stated that "[i]t is now crystal clear that COVID-19 can be deadly to younger children."  https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-540603--,00.html (last visited Dec. 8, 2020).

92.     Despite this statement, data and science support that it is *extremely* rare for COVID-19 to be deadly to younger children. Upon information and belief, the state's own data shows this.

93.     On a national level, the Centers for Disease Control and Prevention (CDC) reports that the death rate of COVID-19 for students in the five to seventeen years-old age range is less than 0.1%. *See* https://covid.cdc.gov/covid-data-tracker/#demographics (last visited Dec. 8, 2020).

94.     The American Academy of Pediatrics' data supports and is consistent with that of the CDC, showing: "Mortality (43 states and NYC reported)- Children were 0.00%-0.23% of all

COVID-19 deaths, and 15 states reported zero child deaths.  In states reporting, 0.00%-0.11% of all child COVID-19 cases resulted in death.  *See* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ (last visited Dec. 8, 2020).

95.     In Michigan, from January 1 to December 8, 2020, there has only been one death associated with COVID-19 in children ages five through fourteen.  *See* https://www.mdch.state.mi.us/osr/Provisional/CvdTable2.asp?fbclid=IwAR35plM6oxH3Cg6Tnwp_9uLKn82gHyfsgnNR7TMbIuMv-09uJdund7DVaNQ (last visited Dec. 8, 2020).

96.     Upon information and belief, the one fatal case in the five to fourteen age range was not contracted in school or from other children, and the child also suffered from meningitis and brain swelling at the time of the COVID-19 diagnosis.

97.     Executive Order 2020-185 also misleadingly claimed that "[g]iven the higher incidence of cases among children in recent months," the situation has amounted to an emergency requiring "the use of masks in the classroom even for younger students."  Data and science do not support this claim.  https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-540603--,00.html (last visited Dec. 8, 2020).

98.     Younger students in grades K-5 have not contracted COVID-19 at a higher rate.  At the time of the implementation of the MDHHS Orders, children in grades pre-school through fifth grade, accounted for only 2% of all COVID-19 cases reported in the schools.  *See* https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173_102480---,00.html (last visited Dec. 8, 2020).

99.     As of the issuance of the MDHHS Orders, the vast majority of the documented COVID-19 cases associated with a school outbreak in the State of Michigan occurred in children sixth grade through college.  *See* https://www.michigan.gov/coronavirus/0,9753,7-406-

98163_98173_102480---,00.html (last visited Dec. 8, 2020). The State acknowledged this fact—and Director Gordon has personally acknowledged this fact in his public statements—in mid-November when it issued the three week "pause" order requiring high schools to close but allowing grade schools to remain open.

100.    Prior to the Defendant Gordon issuing the MDHHS Orders, and consistent with the recommendation of the Governor's COVID-19 Return to School Advisory Council, there was no statewide requirement that children in grades kindergarten through fifth grade wear masks in the classroom.

101.    Despite operating without in-classroom masks for the first 6 to 8 weeks of the school year, the kindergarten through fifth grade age group did not contract or spread COVID-19 at a higher rate than older children or adults who wore masks.  In fact, the data and science consistently demonstrate that this age group is less likely to contract COVID-19 and significantly less likely to contract a serious case.

102.    Particular to instruction of the youngest students in grades kindergarten through fifth grade, the CDC explains that facial masks present challenges, particularly for younger students in early elementary school and students with special healthcare or educational needs, developmental or emotional disabilities, mental health conditions, or sensory concerns or tactile sensitivity.  *See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html (last visited Dec. 8, 2020).

103.    When children are socially distanced from one another while in the classroom, CDC guidelines do not even recommend facial coverings, and it only classifies the use of facial coverings as "may be considered." *See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html (last visited Dec. 8, 2020).

104.    A study posted on the Centers for Disease Control's (CDC) website in May 2020,

concluded as follows: "Disposable medical masks (also known as surgical masks) are loose-fitting devices that were designed to be worn by medical personnel to protect accidental contamination of patient wounds, and to protect the wearer against splashes or sprays of bodily fluids (36).  There is limited evidence for their effectiveness in preventing influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure. Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza."   This study can be found at (https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article) last visited Dec. 8, 2020.

105.    According to the CDC, the risk of COVID hospitalization for those aged 5-17 is 9x lower than those aged 18-29; in contrast, for those aged 85 and up, the risk of hospitalization is 13x higher than those aged 18-29. Likewise, the risk of COVID death for those aged 5-17 is *16x lower* than those aged 18-29; for those aged 85 and up, the risk of death is *630x higher* than those aged 18-29.  https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last viewed Dec. 9, 2020).

106.    Science and data do not support the K -5 mask mandate.

107.    The World Health Organization (WHO) and the United Nations Children's Emergency Fund (UNICEF) advise a multi-faceted approach to the use of masks for children from six years of age to eleven, based upon factors such as: the potential impact of wearing the mask on learning and psychosocial development in consultation with the child's teachers, parents, caregivers, and/or medical providers; the transmission rate of COVID-19 where the child resides; the ability of the child to appropriately use a facial covering; and the cleanliness and laundering of the facial covering.  *See* https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19 (last visited Dec. 8, 2020).

108.    The WHO and UNICEF do not recommend the use of masks on children who are five

years of age.   *See*  https://www.who.int/news-room/q-a-detail/q-a-children-and-masks-related-to-covid-19 (last visited Dec. 6, 2020).

109.    Dr. Mike Ryan, the Executive Director of the WHO Health Emergencies Program, stated that "There is no specific evidence to suggest that wearing masks by the mass population has any potential benefit.  In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly." https://www.cnn.com/2020/03/30/world/coronavirus-who-masks-recommendation-trnd/index.html (last visited Dec. 8, 2020).

110.    A recent study published in the Annals of Internal Medicine conducted at the University of Copenhagen in Denmark recruited 6,024 participants.  Half wore surgical masks in public and half did not.  About 4,860 people completed the study.  Forty-two people in the mask group, or 1.8%, got infected.  Fifty-three in the unmasked group, or 2.1%, got infected.  The difference is not statistically significant. https://www.acpjournals.org/doi/10.7326/M20-6817 (last visited Dec. 8, 2020).

111.    Dr. Henning Bundgaard, the lead author of the study, publicly stated, "Our study gives an indication of how much you gain from wearing a mask.   Not a lot." https://www.cityam.com/masks-only-50-per-cent-effective-against-coronavirus-major-study-finds/ (last visited Dec. 8, 2020).

112.    In a study dated September 11, 2020, and posted on the CDC website, it was reported, *based on a review of actual data*, that "[i]n the 14 days before illness onset, 71% of case-patients and 74% of control participants reported *always using cloth face coverings or other mask types when in public*." https://www.cdc.gov/mmwr/volumes/69/wr/mm6936a5.htm?s_cid=mm 6936a5_w (last visited Dec. 8, 2020).

113.    On June 30, 2020, the Governor, the COVID-19 Task Force on Education, and the Return to School Advisory Council released the Michigan Return to School Roadmap,

recommending but not requiring facial coverings for young children in grades K-5.   *See* https://www.michigan.gov/documents/whitmer/MI_Safe_Schools_Roadmap_FINAL_695392_7.pdf  (last visited Dec. 6, 2020).

114.    The Michigan Return to School Roadmap described safety protocols and required schools and districts "to develop detailed district or building-level plans."   *See* https://www.michigan.gov/documents/whitmer/MI_Safe_Schools_Roadmap_FINAL_695392_7.pdf (last visited Dec. 8, 2020).

115.    The Roadmap described when facial coverings were required to be worn, described safety protocol for sanitization, personal hygiene practice, and proper spacing and movement, among other health and safety protocol.

116.    The Roadmap stated that "[a]ll students in grades K-5 must wear facial coverings unless students remain with their classes throughout the school day and do not come into close contact with students in another class."  https://www.michigan.gov/documents/whitmer/MI_Safe_Schools _Roadmap_FINAL_695392_7.pdf (last visited Dec. 8, 2020).

117.    On August 20, 2020, the Michigan Legislature passed, and the Governor signed, Michigan's Return to Learn law that states:

> A requirement that the district, in consultation with a local health department, as that term is defined in section 1105 of the public health code, MCL 333.1105, and district employees, develop districtwide guidelines concerning methods for delivering pupil instruction for the 2020-21 school year that are based on local data that are based on key metrics.  However, regardless of the guidelines developed under this subdivision, a determination concerning the method for delivering pupil instruction remains with the district.  As used in this subdivision, "key metrics" means, at a minimum, all of the following:
> (i)      The trend of COVID-19 cases or positive COVID-19 tests, hospitalizations due to COVID-19, and the number of deaths resulting from COVID-19 over a 14-day period.
> (ii)     COVID-19 cases for each day for every 1 million individuals.
> (iii)    The percentage of positive COVID-19 tests over a 4-week period.
> (iv)     Health care capacity strength.
> (v)      Testing, tracing, and containment infrastructure with regard to COVID-19.

P.A. 149, § 98a(1)(g) (Mich. 2020).

118.    Plaintiff Resurrection School and the Diocese of Lansing submitted its COVID-19

Plan with appropriate methods for delivering pupil instruction for the 2020-21 school year, including

protocols for when facial coverings would be required; how to increase personal hygiene and enhance

sanitization; timing the movement of students; limiting guests; requiring teachers to exclusively teach

at the school buildings; using cohorts and pods to minimize contact; gaining insight and help from

the parent community to keep the school community safe outside of the school building; and

establishing health screening protocol, all the while remaining devoted to providing a safe, healthy,

and effective learning and faith-filled learning atmosphere.

119.    Resurrection School's plan exceeded the standards set forth by the Roadmap.  In

addition to establishing personal hygiene, screening, social distancing, and sanitization protocol,

Resurrection School took additional precautions such as creating a traffic schedule so no classes

would interact in common areas throughout the day.  Class cohorts were further broken down into

pods, so students would only interact in a pod with three other students.  UV-C lights and air filtration

systems were installed in each room to kill airborne containments.  And the school uses a commercial

grade antimicrobial fogger to disinfect common areas at least three times a day.

120.    To date, Resurrection School has avoided any outbreaks within its school due to

following this strict protocol.

121.    Nonetheless, on September 25, the Governor announced that she would be changing

school protocols by issuing Executive Order 2020-185, requiring all kindergarten through fifth grade

students to wear facial coverings in the classrooms. https://www.michigan.gov/whitmer/0,9309,7-

387-90499_90705-540603--,00.html (last visited Dec. 8, 2020).

122.    Executive Order 2020-185 was set to go into effect on October 5, 2020.  On October

2, 2020, however, the Michigan Supreme Court issued its opinion in *In re Certified Questions*,

nullifying the Governor's authority to issue this order.

123.    In response, the Governor did not seem deterred from the opinion and stated that she would carry out her executive orders through alternative avenues, such as through the Michigan Department of Health and Human Services and local health departments, invoking ostensive authority from Michigan's Public Health Code.

124.    On October 5, 2020, Defendant Gordon, the Director of the Michigan Department of Health and Human Services, created an order requiring all students and staff of schools to wear masks through the entirety of the school day, even when socially distanced in the classroom and trying to engage in the learning process.

125.    The October 5 Order was rescinded.  On October 9, 2020, Director Gordon issued a revised order on behalf on the Michigan Department of Health and Human Services, requiring all students to wear facial coverings throughout the entire school day.  The order contains exemptions for voting, for engaging in a religion service for the purpose of religious worship, and other limited purposes.  There is not, however, any exemption in the order for religious schools, for engaging in religious education, or otherwise for the learning process when students are separated and seated at their desks.

126.    Defendant Gordon noted in his Facts Sheet pertaining to his October 9, 2020 emergency order that his mandate to require facial coverings of all students in Michigan follows the Governors' unconstitutional executive orders "as much as possible" in order "[t]o reduce confusion." https://www.michigan.gov/documents/coronavirus/MDHHS_Epidemic_Order_Oct._9_FINAL_704 767_7.pdf (last visited Dec. 8, 2020).

127.    It was arbitrary and capricious for Defendant Gordon to change the State's K-5 Mask Mandate in private schools without scientific support for the change.

128.    The MDHHS orders have been reissued every couple of weeks.  Defendant Gordon

signed the most current order on December 7, 2020.  https://www.michigan.gov/documents/

coronavirus/Masks_and_Gatherings_order_-_12-7-20_709796_7.pdf (last visited Dec. 8, 2020).

129.    The Governor's facial covering requirement stated that schools were to enforce the

facial    covering    mandate    and    their    students    through    "disciplinary    mechanisms."

https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535121--,00.html  (last  visited

Dec. 8, 2020).

130.    Plaintiffs sincerely believe that it is inconsistent with the Catholic faith to punish and

discipline young students who lack fine motor skills to properly handle facial coverings, or who feel

the need to remove their facial coverings in order to engage in the educational process, or who feel

the need to remove their facial coverings because it is bothersome or distracting, or who remove their

facial covering to better participate in religious formation.

131.    In order to enforce the challenged orders, Resurrection School would have to change

its disciplinary policies, which are based upon their faith, the pursuit of virtue, and care for the whole

child.

132.    The challenged orders require Plaintiffs to either violate their sincerely held religious

beliefs or face criminal prosecution.

133.    The challenged orders provide numerous exceptions from their facial covering

requirement, such as speaking to an audience, being at a public gathering at a polling place or

worshipping at a religious service.  However, Defendants fail to exempt Plaintiffs for engaging in

religious education in a completely non-public classroom with robust and rigorous sanitization and

social distancing policies in place.  Consequently, this broadly enforced order is arbitrary in its

application.

134.    Defendant Gordon asserts that a present emergency necessitates that students sitting

at their desks, socially distanced from one another must wear masks at all times, no matter how the

masks effect the children's ability to engage in religious education.  This assertion is not based on facts or scientific data tailored to the specific exemption sought by Plaintiffs.

135.    There is no emergency within this age group, kindergarten through fifth grade, that requires the MDHHS orders.

136.    There is no significant community spread within the kindergarten through fifth grade age group, especially when they are seated and socially distanced from one another.

137.    In order for a matter affecting health to be considered an emergency, the WHO requires an emergency threshold.  WHO defines emergency threshold as the "[m]ortality rate above which an emergency is said to be occurring.  Usually taken as a crude mortality rate of 1 per 10,000 per day, or as an under-five mortality rate of 2 per 10,000 per day (ODI/HPN paper 52, 2005, Checchi and Roberts)."  *See* https://www.who.int/hac/about/definitions/en/ (last visited Dec. 8, 2020).

138.    The average daily mortality rate for deaths associated with COVID-19 in the State of Michigan the week immediately prior to Defendants' orders was 11 per an estimated 9,986,857 or 0.01 per 10,000.  Furthermore, the mortality rate was zero for children in the age range of kindergarten through fifth grade.  The morality rate in Michigan for children ages five to fourteen since the beginning of January 1, 2020 until today is 0.008 per 10,000.  *See* https://www.mdch.state.mi.us/osr/Provisional/CvdTable2.asp?fbclid=IwAR35plM6oxH3Cg6Tnwp _9uLKn82gHyfsgnNR7TMbIuMv-09uJdund7DVaNQ (last visited Dec. 8, 2020).

139.    The K-5 mask mandate is arbitrary and capricious and is causing Plaintiffs irreparable harm.

## FIRST CLAIM FOR RELIEF

### (Freedom of Religious Exercise – First Amendment & Mich. Const. Art. I, § 4)

140.    Plaintiffs hereby incorporate by reference all stated paragraphs.

141.    By reason of the aforementioned orders, acts, policies, practices, customs and/or

procedures created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to free exercise of religion in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 and the Michigan Constitution, Article I, § 4 (1963).

142.    The challenged orders alter the curriculum and disciplinary policies set forth by Plaintiff Resurrection School as a means of religious education in the non-public classroom; the orders punish and impose discipline on schools and students for exercising their religious beliefs; and the orders interfere with and thwart religious education in the classroom.

143.    Defendants' actions injure Plaintiffs by chilling their religious activity through the threat of discipline and sanctions for failure to comply with the challenged orders.  Defendants' orders require Resurrection School to implement and enforce them, altering the school's normal disciplinary policy.

144.    Defendants' orders require that Resurrection School ignore the well-being of the whole child and diminish parental authority, contravening the Catechism of the Catholic Church, or face sanctions and penalties for failure to comply with the challenged orders.

145.    The Hobson's Choice posed by Defendants' orders is unconstitutional and prohibits Resurrection School from freely exercising its Catholic faith and achieving its mission of providing a Catholic education for the parents and students it serves.

146.    The challenged orders prevent Plaintiff Smith from providing the religious education she wants for her minor child, F.S., and from F.S. receiving this religious education, in violation of their rights to the free exercise of religion protected by the United States and Michigan Constitutions.

147.    The challenged orders prevent Plaintiff Mianecki from providing the religious education he wants for his minor children, C.M., Z.M., and N.M., and the orders prevent C.M., Z.M., and N.M. from receiving this religious education in violation of their rights to the free exercise of

religion protected by the United States and Michigan Constitutions.

148.    Because the challenged orders provide for certain secular exemptions, they are not neutral laws of general applicability, and the orders do not satisfy strict scrutiny.

149.    Alternatively, the orders are unreasonable, arbitrary, and capricious and fail rational basis review.

150.    As a direct and proximate result of Defendants' violation of the First Amendment and Article I, § 4 of the Michigan Constitution, Plaintiffs have suffered, and will continue to suffer, irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF

### (Unlawful Exercise of Authority under Michigan Law)

151.    Plaintiffs hereby incorporate by reference all stated paragraphs.

152.    The challenged orders are unenforceable because Defendants lack the authority to issue them under the Michigan Public Health Code.

153.    MCL 333.2453 authorizes a local health officer to issue an emergency order only upon finding that doing so is necessary.

154.    MCL 333.2453 provides a local health officer with authority to (1) prohibit a public gathering or (2) establish procedures "to insure continuation of essential public health services and enforcement of public health laws."

155.    Defendants' orders requiring masks for young children in kindergarten through fifth grade are unauthorized by state law.  Defendants' orders are not orders prohibiting gatherings nor are they *procedures* to insure public health services.  Instead, the challenged orders are orders requiring the general public to wear masks or face criminal prosecution.  Defendants are not authorized to issue orders for this purpose or condition public life to the wearing of facial coverings or determine how

instruction must be delivered and received within the classrooms of religious schools.

156.    Michigan Public Health Laws "shall not be construed to vest authority in the department for programs or activities otherwise delegated by state or federal law or rules to another department of state government."  MCL333.1114.

157.    Return to Learn legislation, passed by both houses and signed by the Governor, set forth a requirement for schools to submit its learning plan for the 2020-21 school year that included its safety protocols and methods for in person instruction.  Resurrection School submitted its plans in accordance with the law, and their plans were approved.

158.    The Return to Learn legislation delegates the ultimate decision for how instruction will be received, including how facial coverings will or will not be used in the classroom during the educational process, with the school districts.

159.    Defendants' orders constitute an attempt to undo and negate the Legislature's delegation of authority to the educators over how safety protocols will be observed and implemented while achieving the pedagogical goals of the school.  This authority was not delegated to health department officials.  Defendants' orders have no legal force or effect and cannot void the Return to Learn legislation or the school plans submitted and approved under this legislation.

160.    There is no emergency upon which Defendants may act to enforce their orders, and the Defendants' orders do not comport with and are not authorized under the Michigan Public Health Code.

161.    Defendants' orders are unreasonable and arbitrary.

162.    Plaintiffs have no adequate remedy at law for the continuing unlawful action by the Defendants.

## THIRD CLAIM FOR RELIEF

### (Separation of Powers & Non-delegation Clauses – Mich. Const. Art. III, § 2 & Art. IV, § 1)

163.    Plaintiffs hereby incorporate by reference all stated paragraphs.

164.    Defendants' orders are unconstitutional and unenforceable against Plaintiffs because they are based on impermissible delegations of legislative authority in violation of the Michigan Constitution.

165.    The Separation of Powers Clause in the Michigan Constitution provides that "[t]he powers of the government are divided into three branches: legislative, executive, and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Mich. Const. art. III, § 2 (1963).

166.    Article IV § 1 of the Michigan Constitution prohibits delegation of legislative power to protect the public from the misuse of power ostensibly delegated under a Michigan statute.

167.    A delegation of power through legislation cannot be lawful if it permits executive lawmaking.  If a delegation of authority to the executive branch is not sufficiently specific or fails to establish prescribed boundaries, or if the executive branch acts beyond specific boundaries in the legislation, the executive's actions are constitutionally invalid.

168.    Defendants' orders violate the Separation of Powers and the non-delegation clauses of the Michigan Constitution.  The provisions of the Michigan Public Health Code that Defendants rely upon to issue their emergency orders fail to provide proper standards to guide or allow a proper delegation of legislative authority to the executive branch.  This delegation of authority is completely open-ended and overly broad; it permits unbridled law making by the executive branch.  The statute has no temporal, durational, substantive, or legislative checks.

169.    As interpreted by Defendants in the challenged orders, the Michigan Public Health Code gives them cart blanche authority to regulate, condition, and restrict all manners of interactions

in the non-public classroom, all methods and modes of religious education, and all human interaction between students.  Accordingly, Defendants' orders are unenforceable.  Defendants have failed to follow the Return to learn legislation and the Michigan Public Health Code.

170.    Defendants' orders are also unreasonable and arbitrary, and in violation of the Separation of Powers Clause as applied to Plaintiffs.

171.    Plaintiffs have no adequate remedy at law for this continuing unlawful action by Defendants.

**FOURTH CLAIM FOR RELIEF**

**(Substantive Due Process – Fourteenth Amendment & Mich. Const. Art. I, § 17)**

172.    Plaintiffs hereby incorporate by reference all stated paragraphs.

173.    To the extent that the challenged orders restrict Plaintiffs' right to religious exercise and chill religious exercise, they violate Plaintiffs' substantive due process rights.

174.    The First Amendment rights to freedom of religion and freedom of speech are fundamental.  Because Defendants' orders directly curtail fundamental freedoms, they are subject to strict scrutiny.

175.    Defendants' orders are not narrowly tailored and do not serve a compelling state interest.

176.    Defendants arbitrarily exempt public voting gatherings and public religious worship services from their orders but fail to exempt non-public schools that disallow guests and follow strict safety plan.

177.    Because Defendants' executive orders impinge upon Plaintiffs' fundamental rights and impose arbitrary distinctions and prohibitions on Plaintiffs' conduct, they violate substantive due process as applied to Plaintiffs.

178.    As a direct and proximate result of Defendants' violation of the Fourteenth

Amendment as set forth in this First Amended Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## FIFTH CLAIM FOR RELIEF

### (Equal Protection – Fourteenth Amendment)

179.    Plaintiffs hereby incorporate by reference all stated paragraphs.

180.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of State law, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

181.    As set forth in this First Amended Complaint, the challenged orders deprive Plaintiffs of their fundamental rights and freedom.  The orders provide exceptions for other activity and conduct that is similar in its impact and effects (in fact, the orders exempt activities that pose a greater risk of spreading COVID-19), but not for Plaintiffs' constitutionally protected activities.  The challenged measures lack any rational basis, are arbitrary and capricious, have no real or substantial relation to the objectives of the order, and are a palpable invasion of rights secured by fundamental law in violation of the Equal Protection Clause.

182.    When the government treats an individual disparately as compared to similarly situated persons and that disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis, such treatment violates the equal protection guarantee of the Fourteenth Amendment.  As set forth in this First Amended Complaint, the challenged orders violate the equal protection guarantee of the Fourteenth Amendment.

183.    As a direct and proximate result of Defendants' violation of the equal protection guarantee of the Fourteenth Amendment as set forth in this First Amended Complaint, Plaintiffs have

suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A)      to declare that Defendants violated Plaintiffs' fundamental constitutional rights and Michigan law as set forth in this First Amended Complaint;

B)      to enjoin Defendants' enforcement of the challenged orders as set forth in this First Amended Complaint;

C)      to award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

D)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

GREAT LAKES JUSTICE CENTER

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino (P70886)
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
Tel: (517) 322-3207; Fax: (517) 322-3208
erin@greatlakesjc.org

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

GREAT LAKES JUSTICE CENTER

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino

.